## Commonwealth *v.* Ross, Appellant.

Argued June 8, 1959. Before RHODES, C.J., HIRT, GUNTHER, WRIGHT, WOODSIDE, ERVIN, and WATKINS, JJ.

*Cecil B. Moore,* for appellant.

*Domenick Vitullo,* Assistant District Attorney, with him *Juanita Kidd Stout,* Assistant District Attorney, and *Victor H. Blanc,* District Attorney, for appellee.

OPINION BY ERVIN, J., July 3, 1959:

Appellant appeals from judgments and sentences imposed by the court below on four bills of indictment charging him with conspiracy to commit rape, rape, conspiracy to rob and aggravated robbery. The facts are fairly stated in the opinion of the court below as follows: "On May 12, 1956, at about 3:00 a.m., the prosecutrix, a young white girl of 16, and her escort, William Device, were parked in his car near Edgley ball field, close to the 33rd and Diamond Street entrance to Fairmount Park, in Philadelphia. They had attended a party in Wynnefield and had stopped in the park on their way home. Suddenly the doors of their car were pulled open and two young colored men got in. One was Samuel Ross, the defendant. He had a revolver in his hand. His companion was holding in his hand either a piece of lead pipe or a blackjack.

"Ross got in on the passenger side and made Device get out of the front and into the back of the car. Then Ross climbed over the prosecutrix into the driver's seat. Device was made to kneel on the floor in the back of the car with his head down and away from Ross's accomplice, who sat over him holding in his hand the

blackjack or piece of a lead pipe. Ross then drove further into the park toward a wooded area.

"Device was terrified. He thought the two men wanted his car or his money. He pleaded with them, 'Don't harm us,' and offered his wallet, which they took from him.

"After the car was driven a short distance to a more secluded area, Device was ordered to take his car and drive away. He did so and reported to the police station at 22nd and Hunting Park Avenue. With the police, he subsequently drove back to the Park and searched for the prosecutrix. They found her shoes and handbag and signs of a struggle.

"Ross, meanwhile, had pulled the prosecutrix from the car and further back from the road. She screamed and struggled, and hit the defendant with her handbag. She fell and Ross and his accomplice dragged her. Then Ross hit her and threw her to the ground. The accomplice held her down. Ross pulled up her skirt, ripping it. He forced her legs apart and had intercourse with her, ejaculating within her. Then Ross held her and the other man had intercourse with her and also ejaculated within her.

"Meanwhile, she was screaming, but Ross had put his hand over her mouth. She bit his fingers and he then forced his fingers down her throat.

"When she finally managed to get up, after both men had raped her, they threatened to kill her if she continued to scream. They ran further into the Park and disappeared. She struggled out to a road. A car coming along stopped for her. She was hysterical. The young man and woman in that car took her to the Woman's Hospital. Her clothes had been ripped and torn and she had lost her handbag and shoes in the Park. They were found later that night by the police.

"The young man and woman, who picked her up after the incidents above described, testified that, when they saw the prosecutrix at the roadside, she was hysterical and hollering for help. She told them she had been raped by two colored men who had chased away her escort. They took her to a hospital. Her clothes were torn, she had no shoes or handbag, and her hair was wild. Her face was red and she had black and blue marks on her.

"Park Guard Howell that night went to the described area and drove back to the wooded portion. There he found her handbag and saw signs of a struggle.

"Sergeant Brosius of the Park Guards found the shoes of the prosecutrix about 250 yards further from the road. At the spot where the shoes were found, he saw that the grass had been trampled down in an area about six feet square.

"Detective Kates of the Park Guards at 3:30 a.m. that night saw the prosecutrix at the Woman's Hospital. She was hysterical. There were marks on her left breast and on her cheek. They appeared to him to be bite marks or bruises.

"The testimony of Dr. Kianorri at a previous trial was read into evidence by agreement, due to the fact that prior to the second trial she had returned to her home in Persia. This doctor testified that she examined the prosecutrix when she was brought into the hospital at 3:30 a.m. Some of her clothes were torn off and she had no shoes. She was very excited and emotional. Her genitals were irritated. Her upper legs showed trauma. A vaginal smear showed sperm in her vagina; in fact, her vagina was full of sperm. She complained of pains in her body. There was trauma on her face and her whole body. Her face showed biting and abrasions."

The principal question concerned the identity of the defendant. Prior to defendant's arrest, the police had shown prosecutrix a large number of photographs of young negroes and she picked out and identified a police photograph of the defendant. It was on the basis of that identification that the police arrested the defendant. Thereafter she twice picked him out in police line-ups. On each occasion she called attention to his eyes as being unusual. In the cell room she said: "This is the man." The defendant remained silent. The defendant attempted to prove an alibi. His only witness was a sister. She testified that defendant and one of his brothers slept in the same room and that she didn't know of his going out any night in May of 1956. She admitted that she would not have known if the defendant had gone out after she went to sleep unless he awakened her in doing so. The sister and her husband, the defendant and his two brothers and the defendant's father all slept in adjoining bedrooms on the second floor of the small house in which they resided. Her husband and the defendant's two brothers, one of whom slept in the same room with defendant, were not even brought to the trial by defendant. His father, who slept in an adjoining room, was in the court and was not called as a witness.

The appellant's arguments will be disposed of in the same order in which they were presented by him in this Court.

Appellant first contends that the court below unduly interfered with his counsel's cross-examination. We have carefully reviewed the record and find no substance to this contention. On cross-examination leading questions may be asked but misleading questions may not be asked. Setting verbal traps for a witness is not a legitimate branch of the art of cross-examination: *DiBona, Admr. v. P. T. C.,* 356 Pa. 204, 208, 51 A. 2d 768.

It is also claimed that the court below created sympathy for the prosecutrix. In support of his contention, appellant points to an occasion when defense counsel raised the point of the victim's emotional state while testifying at a previous trial and the court said: "What would you expect of any person on the witness stand under these circumstances? Would she be entirely calm, in your opinion?" We are in accord with Judge OLIVER's disposition of this contention, as follows: "This question obviously was directed at the fact that *any* young prosecuting witness in *any* rape case, whether or not *in fact* the rape had occurred, would be emotionally upset while undergoing close questioning on the intimate details of the rape before a courtroom of people. Counsel . . . attempts to read something into the Court's remark that clearly was not there. It is evident from counsel's failure to object at the time of trial that at that time he then understood the Court's comment in the spirit in which it was intended."

It is also argued that the court erred in instructing the jury regarding the violation of the sequestration order. It appeared that William Device and Norma Lubin, before Device testified, briefly discussed Miss Lubin's emotional state while she was testifying and whether the weapon in the hands of one of the attackers had been a lead pipe or a blackjack. Device testified when called that it was a lead pipe. It is plainly evident that the violation of the order in no way affected Device's testimony. Furthermore, the court properly instructed the jury that they could take into consideration the extent that the violation might have affected the witness' testimony: *Com. v. Turner*, 389 Pa. 239, 133 A. 2d 187. Miss Lubin identified the appellant as one of her assailants, whereas Device failed to make a positive identification. The purpose of separating witnesses is to prevent the shaping of testimony to cor-

respond with that given earlier in the trial: *Com. v. Sloat,* 298 Pa. 10, 147 A. 834. The appellant was not harmed by the violation of the sequestration order because it is apparent that Device did not shape his testimony to correspond with that given by the victim: *Com. v. Nestor,* 183 Pa. Superior Ct. 350, 353, 132 A. 2d 369.

The jury was not coerced into giving a verdict against the defendant. Appellant states in his brief that the jury was charged on four different occasions. A review of the record will reveal that the jury was charged once and instructed briefly on other occasions. After deliberating for approximately two and a half hours, the jury informed the court that they could not agree upon a verdict. The trial judge then said to the jury: "I would like you to go out and see if you cannot possibly reach a verdict. I am not forcing you to do it at all, but I would like you to make a further effort, strictly on the evidence and the charge of the Court as to the law." The jury then further deliberated and finally agreed upon a verdict of guilty. This was not coercion of the jury. In *Com. v. Campbell,* 116 Pa. Superior Ct. 180, 189, 176 A. 246, it is stated: "It is entirely proper for a trial judge, in an endeavor to prevent another long and expensive trial, to admonish a jury as to the propriety and the importance of agreeing on a verdict, and he may urge the jury to make every reasonable effort to harmonize their views and to bring in a verdict consistent with their consciences."

The court below did not err in permitting the testimony of a witness to be read to the jury upon their request, after deliberation had begun. While the sending out of part of the testimony to a jury is error, *Com. v. Ware,* 137 Pa. 465, 20 A. 806; *Com. v. Brown,* 264 Pa. 85, 107 A. 676, we have ruled that it is not an abuse of discretion for the trial judge to permit the testimony

of a witness to be read to the jury: *Com. v. Fontaine*, 183 Pa. Superior Ct. 45, 128 A. 2d 131.

It is further contended by the appellant that it was error for the court to tell the jury not to be swayed by defense counsel's speech in summation. The court said: "I want to say just one word to you. You heard a tremendously emotional plea—talk about crucifying someone. There is no effort to crucify anybody in this Court. You have a simple question of fact: Is the defendant guilty, or isn't he? I want you to go out and calm down and come back and realize you have to deal with the facts, and you have to apply to those facts the law as I shall outline it." This was not a statement by the court that the jury was not to be swayed by defense counsel's speech. It was merely an attempt by the trial court to correct flagrant misstatements made by counsel. There was no evidence in this case that anybody was being "crucified." It is the duty of the court to confine the arguments of counsel within the limits of legitimate advocacy: *Com. v. Nelson*, 294 Pa. 544, 144 A. 542; *Com. v. Wood*, 118 Pa. Superior Ct. 269, 179 A. 756; *Com. v. Kauffman*, 155 Pa. Superior Ct. 347, 38 A. 2d 425; *Com. v. Phillips*, 183 Pa. Superior Ct. 377, 132 A. 2d 733.

In his next point, appellant states that the court committed error in instructing the jury "that they might infer that the uncalled witnesses would have testified unfavorably to the defendant." The court did not so instruct the jury. In the court's charge it reviewed the sister's testimony, pointed out its weaknesses and commented that other members of defendant's family, all occupying adjoining rooms in a small house, were not called to corroborate defendant's alleged alibi (that he was home asleep all night), even though one of them, the father, was present in court and one of the brothers occupied the same bedroom as defendant.

This was merely a comment on the evidence which the trial court could properly make: *Com. v. Cisneros,* 381 Pa. 447, 113 A. 2d 293. At no time did the trial judge state that any inference or presumption could be drawn from defendant's failure to produce these witnesses. To constitute error, the reference to the defendant's failure to call a witness must be adverse. In other words, it must indicate a duty of the defendant to call the witness and permit an unfavorable inference to be drawn from his failure to do so. It might have been inferred from the court's statement that the reason the other members of the family did not testify was because, like the appellant's sister who did testify, they did not know, one way or the other, whether the appellant was in bed asleep at the time of the attack.

The court did not err in characterizing the photograph of appellant, identified and selected by the victim from a number of photographs submitted to her by the police, as a prior description given by the victim. To "describe" is "to represent by a drawing, statue, or picture": Webster's Unabridged New International Dictionary, Second Edition. The court, therefore, did not err in stating to the jury that the picking out of the photograph constituted a good description.

The court did not err in refusing the following point for charge: "Proof beyond a reasonable doubt of the identification of the accused as the person who committed the crime is essential to a conviction. Where the witness is not in a position to clearly observe the assailant or he is not positive as to identity, or his positive statement to identify is weakened by qualification or by failure to identify the defendant on one or more prior occasions the accuracy of the identification is so doubtful that the court should warn the jury that the testimony as to identity must be received with caution." This point is predicated upon an incorrect as-

sumption of fact. Here the victim was positive in her identification of the appellant. She testified that it was not extremely dark that night and that each time the car doors were opened and all of the time they remained open, a light was on inside the car enabling her to see the defendant's face distinctly. Also, he bit her in her face and to do this his face had to be close to her face. At the trial she identified the defendant positively and stated that she never could forget "that face." She also stated that she had particularly noticed the man's "unusual eyes." In the opinion of the court below it is stated that "defendant in fact has an unusual and flashing pair of eyes of a type rarely seen in a Negro." The victim did not fail to identify the defendant on one or more prior occasions.

It is also argued that the court's reference to race while instructing the jury on further deliberation, constituted a tool for coercing a verdict against the defendant. The instruction given by the court was more favorable to the defendant than to the Commonwealth and the court carefully instructed the jury that it was to make a further effort strictly on the evidence and the instructions as to the law. It was entirely proper for the court to give this instruction: *Com. v. Cisneros,* supra, at page 453.

Appellant also argues that it was physically impossible for the prosecutrix to be raped by one assailant while another assailant sat on her chest. We are entirely satisfied with the lower court's disposition of this point, as follows: "For obvious reasons, we shall not discuss details regarding this contention. We are firmly convinced there is no merit to it whatsoever. One need only give some thought to the relative strength and positions of the parties to understand that the rape could have been accomplished in many ways. Furthermore, had defense counsel had any doubts on

this score, he could easily have questioned the prose-cutrix concerning them at the trial. He did not do so. He made no mention of this point in his argument to the jury."

There was ample evidence submitted to the jury to justify a finding that Miss Lubin was raped. We are also of the opinion that the evidence concerning identification was sufficient upon which to find a verdict of guilty.

Judgments affirmed.