## Commonwealth *v.* Smith, Appellant.

Argued November 14, 1973. Before WRIGHT, P. J., WATKINS, JACOBS, HOFFMAN, CERCONE, and SPAETH, JJ. (SPAULDING, J., absent.)

*John J. Dean*, Chief, Appellate Division, with him *John R. Cook*, Trial Defender, and *George H. Ross*, Public Defender, for appellant.

*James Wilson Bush*, Assistant District Attorney, with him *Robert L. Eberhardt*, Assistant District Attorney, and *Robert W. Duggan*, District Attorney, for Commonwealth, appellee.

OPINION BY SPAETH, J., April 3, 1974:

Appellant was convicted by a jury of attempted statutory rape and indecent assault.* Instead of being sentenced he was committed under the Mental Health and Mental Retardation Act of 1966, Act of Special Sess. No. 3, Oct. 20, P. L. 96, art. IV, §410, 50 P.S. §4410, to Farview State Hospital for a period not to exceed three years.

The facts may be summarized as follows. On the evening of January 25, 1973, the prosecutrix, who was fourteen years old, was babysitting at a neighbor's home in Duquesne, Pennsylvania. Also present were several other young people, including appellant, who was twenty-two years old and was a friend of the prosecutrix's family (especially of her older brothers; he had no special relationship with the prosecutrix). About 8:00 p.m. the mother of the prosecutrix telephoned to ask if she was all right. The prosecutrix said that appellant was bothering her and would not leave her alone. Just then, appellant had begun to embrace her

---

* The trial judge directed a verdict in appellant's favor on a charge of forcible rape.

and was trying to kiss her. After talking with her mother, the prosecutrix tried to call a friend. Appellant would not allow her to use the downstairs telephone so she went upstairs to place the call. Appellant followed her and again prevented her from using the telephone. Appellant then pushed the prosecutrix down on a bed and lay on top of her. She struggled with him, tried to resist his attack, and cried for help. He hit her and tore off her clothing. At least one adult male witnessed these events but did nothing. Two of the children with whom the prosecutrix was sitting were also present; one of them ran for help. Eventually the other people in the house pulled appellant off the prosecutrix. Appellant ran downstairs, where he briefly fought with his brother, and out of the house. He was arrested twenty minutes later.

## Competency To Stand Trial

Of the numerous contentions appellant makes, the most disturbing concerns his competency to stand trial.

After the jury had been selected and just before the trial was to begin, appellant's counsel requested that the trial be delayed and a sanity commission consisting of two psychiatrists and an attorney be appointed to determine whether her client was competent to stand trial.* Counsel attempted to explain her failure to

---

* Counsel was apparently seeking to invoke §408 of The Mental Health and Mental Retardation Act of 1966, *supra,* 50 P.S. §4408, which reads in part:

"(a) Whenever a person who has been charged with crime is detained in a penal or correctional institution and he is believed to be mentally disabled so that his commitment to a facility is necessary, a petition for such commitment may be presented to the court of the county where he stands charged with crime. The petition may be made by the warden or other officer in charge

raise the matter earlier by stating that the President Judge had told her to make her request to the trial judge but the case had not been assigned to a trial judge until it was too late. The trial judge denied her request but conducted "a conference in Chambers"* on the matter of appellant's competency. After questioning appellant, the judge heard from a Mr. Minneci of the Behavior Clinic.

Appellant described himself as the oldest of ten children. When asked about his educational background, he stated that from the time he had had a "nervous breakdown", following the death of his mother, he attended a special education school in Clairton. He could not remember the name of the school, nor could he remember whether he had ever attended a regular grade school. With respect to his recent medical history, he said (without reference to any specific date), "I was going to the clinic over in McKeesport," and that a year ago, "I was in Woodville [Hospital] ... for a month. ... My parole officer put me up there because I had bad nerves. I was getting liquid Thorazine, injection shots." He went on to say that he had been in jail for 110 days prior to trial,** during part

of the detaining institution, a relative of the detained person, the detained person or his counsel or the attorney for the Commonwealth.

"(b) To assist in determining the questions raised by the petition the court may adopt one or any combination of the following procedures:

. . . .

"(2) Appoint a commission consisting of two physicians and an attorney which shall examine such person in the detaining institution and in addition, receive any other evidence from any source bearing upon the questions of whether the person is mentally disabled and whether his commitment is necessary.

* So far as the record discloses, the conference was informal; although what was said was transcribed, it was not under oath.

** If appellant was in jail from the day of his arrest until the day of trial, he would have been in jail 89 days.

of which time he was confined in the hospital section. "They was giving me medication for a little while, and they had me strapped down up there." He said that "the medicine calms my nerves, it makes me tired and makes me fall asleep . . .", but that he had not received any medicine in the month prior to trial, including the day before and the day of trial. Appellant stated that he recognized his lawyer and had met and talked with her two or three times in preparation for trial. After explaining the nature of a jury trial, the trial judge said: "Now the question that your lawyer has raised here is whether or not you are in mental shape to go to trial. Do you feel competent enough to stand trial, that you have been able to cooperate with her enough to help her in preparing for the case so as to put forth the best defense she could for you? How do feel about that?" Appellant replied, "I feel okay. I am a little bit nervous though." The judge went on to question appellant about his understanding of the charges against him, asking, "What would a person have to do to be guilty of rape?" After the judge rephrased the question, the appellant said, "whenever you take it, whenever she ain't willing, that's rape." He also said that he knew that in statutory rape, "The girl is younger." He also knew he could "serve time" if convicted of the charges against him.

Following this colloquy with appellant, the judge received a statement from "Mr. Minneci" (a full name is not of record). Mr. Minneci is connected with "the Behavior Clinic" and is evidently known by the judge and both counsel. It may be assumed that the Behavior Clinic is operated by the court to advise it with respect to the competency to stand trial of persons charged with crimes and also with respect to sentencing. However, Mr. Minneci's title and functions at the Clinic are not of record.

Mr. Minneci stated that "[appellant] has been seen by Dr. Bowman and Dr. Davis. He has also been tested by Dr. Ruby, a psychologist. All of these gentlemen agree that [he] is competent to go to trial. His main difficulty, he is mentally retarded. But he understands and fits into the category—we see no point in delaying this case, if it can be avoided, because [he] has been a management problem in the County Jail. I happen to know [appellant] very well. . . . He's been a problem in the jail, in that he doesn't get along too well and it has been necessary from time to time to put him in the jail hospital and shackle him down, tie him, chain him to the bed. Therefore, it would be in the best interest of everyone concerned."

When asked by the judge whether appellant had been restrained "because of his mental competency or is he a disciplinary problem?", Mr. Minneci replied, "He is a disciplinary problem more than anything, Your Honor." When asked by the judge, "Now, what was the occasion for the clinic making a determination of his competency; was the question raised by someone?", he replied: "No, Your Honor. We routinely see all cases of Rape, Murder, certain categories of crimes, and the crime that [appellant] had committed was one of those that routinely is seen by the Behavior Clinic. We also have seen him on prior occasions because of his mental disability and in regard to his being somewhat mentally defective."

When asked by counsel for appellant, "What standards are used to evaluate competency?", Mr. Minneci replied, "Well, regular psychiatric examination. Mr. Davis would be available—I don't know whether he is there now—he was over in the County Jail, but he'd be available to testify." Later, when counsel asked again "what standards are used," he replied, "Well, I am not a psychiatrist, so I wouldn't want to answer that."

In applying for the appointment of a sanity commission, counsel for appellant had said to the court: "Mr. Minneci had a complete file on my client. The file indicated that his IQ is 58. Mr. Minneci indicated they believe he has severe mental problems which would require treatment. And he suggested that he be committed, if convicted, in lieu of sentence . . . to Farview. . . ." In the conference in chambers, Mr. Minneci repeated this opinion, telling the judge that "it was the unanimous opinion" that "if adjudged guilty . . . [appellant] should be committed . . . to a State Mental Hospital, in lieu of sentence." So far as appears, he did not produce the file to which counsel had referred. Nor did Dr. Davis or any other person who had examined appellant appear before the judge.

Following Mr. Minneci's statement, the judge concluded that appellant was competent to stand trial, the parties returned to the court room, and the jury was sworn.

In appraising this proceeding it may be noted initially that there can be no question that the oral request by appellant's counsel that a sanity commission be appointed was both improper in form and untimely. Requests for psychiatric examinations should be made prior to trial, Pa. R. Crim. P. 304, Reporter's Comments, in writing, Pa. R. Crim. P. 304(a), and at least "ten days before trial unless opportunity therefor did not exist or the defendant or his attorney was not aware of the grounds for the application." Pa. R. Crim. P. 305.

Nonetheless, given the information in counsel's request for a sanity commission—that the Behavior Clinic "believe[d] [appellant had] severe mental problems . . . [and should] be committed, if convicted"—the trial judge properly concluded that he should inquire into appellant's competency, despite counsel's failure to

comply with the rules. When a defendant is incompetent to stand trial, a problem of constitutional dimensions exists. "If a defendant is incapable of cooperating with his defense counsel, because of mental illness he cannot take advantage of the basic protections [due process of] law affords. . . ." *Commonwealth v. Kennedy,* 451 Pa. 483, 488, 305 A. 2d 890, 893 (1973). Moreover, "if a man . . . [is] unable to cooperate with his counsel because of mental illness, the protections which [the constitutional right to] counsel can provide become a nullity." *Id.* at 489, 305 A. 2d at 893. Inquiry is therefore wise whenever there arises from the evidence, no matter how presented to the trial judge, a reasonable doubt that the defendant is competent to stand trial. *Pate v. Robinson,* 383 U.S. 375 (1966) ; *Commonwealth v. Bruno,* 435 Pa. 200, 204, 255 A. 2d 519, 521 (1969) ; Lewin, Incompetency to Stand Trial: Legal and Ethical Aspects of an Abused Doctrine, 1969 Ariz. State L. J. 233, 278.*

Inquiry here having been made, the question becomes whether the judge's ruling that appellant was competent is supported by sufficient evidence.

In resolving this question, the usual rule is that "the person asserting mental incompetence to stand trial has the burden of proving incompetency by a preponderance of the evidence. Cf. Commonwealth v. Carluccetti, 369 Pa. 190, 85 A. 2d 391 (1952) ; Commonwealth v. Simanowicz, 242 Pa. 402, 89 A. 562 (1913)." *Commonwealth v. Kennedy, supra* at 487, 305 A. 2d at 892. In the present case, however, this rule

---

* None of this is to excuse careless practice by counsel. Nor do we suggest that a trial judge is not free to decline to explore a defendant's competency to stand trial where the issue has not been raised as required by Pa. R. Crim. P. 305, or where it appears that the issue is frivolous or raised in bad faith or otherwise insufficient to create a reasonable doubt of the defendant's competency.

is not useful, for appellant was handicapped in establishing incompetence because of his inability to procure an independent psychiatric examination. In these circumstances we shall evaluate the sufficiency of the evidence without reference to burden of proof.

As stated in *Commonwealth ex rel. Hilberry v. Maroney*, 424 Pa. 493, 495, 227 A. 2d 159, 160 (1967): "[T]he test to be applied in determining the legal sufficiency of [a defendant's] mental capacity to stand trial . . . is not the M'Naghten 'right or wrong' test, but rather his ability to comprehend his position as one accused of [a crime] and to cooperate with his counsel in making a rational defense. . . . Or stated another way, did he have sufficient ability at the pertinent time to consult with his lawyers with a reasonable degree of rational understanding, and have a rational as well as a factual understanding of the proceedings against him." See *Dusky v. United States*, 362 U.S. 402 (1960). Due regard should be given to "the capacity of [the defendant] to understand the nature and object of the proceedings against him, to comprehend his own condition in reference to such proceedings, to understand the nature of the punishment which might be inflicted upon him, to confer with his counsel with reference to such proceedings, to make a rational defense, and the probable effect of the trial on such person's physical and mental condition." Mental Health and Mental Retardation Act of 1966, *supra* §408(d), 50 P.S. §4408(d). The decision rests within the sound discretion of the trial judge. *Id.* It should be an informed one, based on evidence. The inquiry the judge makes before arriving at a decision should be "as careful and complete as reasonably feasible in order to insure a fair trial, . . ." *United States v. Crosby*, 462 F. 2d 1201, 1203 (D.C. Cir. 1972).

In the present case it appears from the trial judge's opinion that he relied on the conclusions

reached by staff members of the Behavior Clinic.* He did not know, however, on what facts these conclusions were based, nor what standard had been used. As has been mentioned, none of the staff members testified, nor were any of their written reports admitted into evidence. Mr. Minneci's statement as to their conclusions was hearsay; and while Mr. Minneci also gave his own opinion as to appellant's competency, he acknowledged that he was not a psychiatrist, and nothing in the record supports a finding that he was competent to express an opinion. It is true that the judge also spoke to appellant. From our reading of the judge's colloquy with appellant, it appears that appellant may have had an understanding of the charges against him and of the possible consequences of conviction. However, by itself the colloquy cannot support a finding of competency, particularly in view of the information in the colloquy regarding appellant's past mental instability.

In *Commonwealth v. Bruno, supra,* it was held that neither the confrontation clause nor considerations of due process require that the hearsay rule apply in sanity commission hearings. Presumably, the same

---

* The opinion reads in part as follows: "The trial court, in the interests of justice, upon learning of defendant's desire to request psychiatric examination, after the jury was picked, conducted a hearing, on the record, and out of the presence of the jury. During this hearing defendant's attorney indicated knowledge of a Behavior Clinic opinion that the defendant was competent to stand trial. Nevertheless, the trial court conducted a colloquy with defendant as a result of which it was the court's opinion that the defendant was competent to stand trial. The representative of the Behavior Clinic joined the colloquy and reported that Doctors Bowman and Davis, psychiatrists, as well as Dr. Ruby, psychologist, agreed in their opinion as to defendant's competence to stand trial in spite of being mentally retarded." [References to pages where evidence appears in the record have been omitted.']

holds true in hearings conducted by a trial judge. Nevertheless, the extent to which a judge's final determination rests upon hearsay should be limited, especially where the hearsay consists of psychiatric conclusions. As stated in Note, Incompetency to Stand Trial, 81 Harv. L. Rev. 454, 470-471 (1967) : "To the extent that psychiatric testimony is utilized, however, it should be descriptive of the defendant's condition rather than conclusory. Like criminal responsibility, incompetency is a legal question; the ultimate responsibility for its determination must rest in a judicial rather than a medical authority. In relying on conclusory psychiatric testimony, often expressed in the same terms as the ultimate incompetency question, courts shift responsibility for the determination to psychiatrists who have no special ability to decide the legal issue. Indeed, there is repeated evidence that psychiatrists often misunderstand the test of incompetency and confuse it with the test of criminal responsibility. Medical opinion about the defendant's condition should be only one of the factors relevant to the determination. A defendant's abilities must be measured against the specific demands trial will make upon him, and psychiatrists have little familiarity with either trial procedure or the complexities of a particular indictment. . . . Finally, a more critical view of psychiatric testimony would tend to lessen the disadvantages felt by defendants unable to hire their own expert witnesses." [Footnotes omitted.]

When the limitations of the record here are weighed, the conclusion cannot be avoided that there was insufficient evidence to support the ruling that appellant was competent to stand trial. Accordingly, the matter must be remanded for a fuller hearing.

Appellant's trial was held on Monday, April 23, 1973, or about a year ago. A retrospective hearing to determine if appellant was competent at the time he

was tried should be adequate to protect appellant's rights. It may be expected that one or more of the staff members of the Behavior Clinic who examined appellant prior to trial will be available to testify. At any rate, the reports they prepared will supply contemporaneous evidence on the issue of appellant's competency. *See Barefield v. New Mexico,* 434 F. 2d 307 (10th Cir. 1970), *cert. denied,* 401 U.S. 959 (1971) (retrospective hearing permissible 3½ years after entry of plea where psychiatrists who examined defendant prior to it were available to testify).

If after the retrospective hearing, appellant is found to have been incompetent at the time of his trial, the provisions of §408 of the Mental Health and Mental Retardation Act of 1966, *supra,* 50 P.S. §4408, should be invoked and a new trial held later on. If appellant is found to have been competent, his trial will stand. Because of this latter possibility, we reach the trial errors appellant raises. None of them has merit.

The Trial Judge's Examination of the Prosecutrix

Appellant contends that a mistrial should have been declared after the trial judge questioned the prosecutrix because the examination was "prejudicial", "involved repetitive and leading questions", and "placed the trial court in a position before the jury of presenting the prosecution's case."

On direct examination the prosecutrix (who it will be recalled was fourteen years old) had difficulty describing what occurred. It was impossible to determine from her testimony whether appellant achieved penetration. She stated that while appellant was on top of her "[he] started to get it in, you know move." The Assistant District Attorney asked her what part of appellant's anatomy she was referring to when she said "it". The prosecutrix responded, "[t]he bottom," but

would not elaborate.* After the direct and cross-examinations were concluded, the trial judge over objection asked the prosecutrix a number of questions. He too was unable to elicit specific responses. He urged the prosecutrix to "overcome any reluctance or embarrassment that you might have momentarily and to be as plain and specific as you can, if you can be plain and specific, about exactly what happened," but to no avail. He concluded his questioning as follows: "Q. Do you know what the defendant is in court here for, Robin? A. Yes. Q. What is he here for? A. Rape. Q. What has been said that he did? A. Rape. Q. Against whom was this rape committed? A. Me.

. . . .

"Q. And just how was it committed? What happened with you and Meredith that makes you now say that there was a rape committed? A. (No verbal response). Q. Are you able to say? A. (No verbal response)."

In *Commonwealth v. Myma,* 278 Pa. 505, 507-08, 123 A. 486, 487 (1924), it was said:

"A judge in a jury trial has a right to interrogate witnesses. It sometimes becomes his duty to do so, even to the point of recalling a witness to supply an omission of proof on a material point: Boggs v. Jewell Tea Co., 266 Pa. 428, 434; State v. Jackson, 87 S.C. 407, 69 S.E. 883; Lycan v. People, 107 Ill. 423. But a judge may so conduct an examination as to make it an abuse of discretion, requiring a new trial.

---

* There was the following: "Q. Do you know what that bottom is called? A. I forget. Q. All right, do you have on your body what he tried to get into yours? A. I did. Q. Now, let me—let me see if I can better express this. This part of the body that he tried to get into yours, this physical part of his body, do you have the same physical feature, the same part on your body as he does on his? A. No."

"Witnesses should be interrogated by the judge only when he conceives the interest of justice so requires. It is better to permit counsel to bring out the evidence and clear up disputed points on cross-examination unaided by the court; but where an important fact is indefinite or a disputed point needs to be clarified, the court may see that it is done by taking part in the examination. The practice of a judge entering into the trial of a case as an advocate is emphatically disapproved. The judge occupies an exalted and dignified position; he is the one person to whom the jury, with rare exceptions, looks for guidance, and from whom the litigants expect absolute impartiality. . . ."

See also, *Commonwealth v. McCoy*, 401 Pa. 100, 104, 162 A. 2d 636, 642 (1960) (MUSMANNO, J., concurring and dissenting) (questioning proper if designed to clarify issues, remove ambiguity, and protect the rights of parties and witnesses); *Commonwealth v. Watts*, 358 Pa. 92, 56 A. 2d 81 (1948) (questioning improper if it shows bias or feeling or is unduly prolonged); A.B.A. Canons of Judicial Ethics No. 15 (intervention to promote expedition, prevent unnecessary waste of time, or clear up obscurity proper; undue interference, impatience, or participation or a severe attitude toward witnesses may be counter-productive).

Applying these standards, we find no abuse of discretion here. The trial judge's questions, although repetitive, went to an important issue in the case. It was in the interest of both the Commonwealth and appellant that this issue be clarified. The trial judge waited until both attorneys had finished their questions; thus, he did not interfere with either attorney's presentation. His questioning was not unduly prolonged, nor did it indicate bias or prejudice in favor of either side. Finally, the jury in rendering a verdict of guilty of attempted statutory rape resolved the matter in appellant's favor.

Appellant also cites the judge's failure to "use the word 'allegedly' when he questioned the witnesses as to what was done and by whom." When the questions are considered in context, it is clear that the judge was merely exploring whether the prosecutrix understood the allegations that were being made against appellant. The judge's questions did not indicate that he thought the allegations had been established in fact. The prosecutrix's inability to express herself gave rise to some doubt as to whether she understood the allegations, and the judge, whose manner was evidently intended to alleviate her uneasiness about testifying more specifically, did no more than attempt to assess her knowledge on the matter. *See Commonwealth v. McGuiness*, 204 Pa. Superior Ct. 75, 203 A. 2d 326 (1964) (court's questioning and use of leading questions permissible where rape victim's modesty and delicacy precluded full answers).

### Testimony by the Prosecutrix After Violation of Sequestration Order

The prosecutrix was followed to the stand by Dr. Karen Green and Doris Hamilton. Dr. Green, a resident in obstetrics and gynecology, examined the prosecutrix on the night she was attacked by appellant. Doris Hamilton was one of the persons who pulled appellant off the prosecutrix. After Ms. Hamilton's testimony, the court recessed for lunch. When court reconvened, the Assistant District Attorney asked to recall the prosecutrix, stating in chambers that he had talked with her during the lunch break and she was now prepared to answer questions she had not responded to before. Appellant's counsel objected. At the beginning of trial the judge had ordered the sequestration of all witnesses in the corridor outside the courtroom. In violation of that order the prosecutrix had sat in

the courtroom and had heard all or part of the testimony of Dr. Green and Ms. Hamilton. The judge nonetheless permitted her recall. She then stated that appellant "pulled out his penis" and "started to put it in me," into "my vagina", but "I jerked and it came out." On recross-examination it was brought out that the prosecutrix and the Commonwealth's attorney had conversed during lunch.

It is within the sound discretion of the trial judge to permit a witness who has violated a sequestration order to testify. *Commonwealth v. Martin,* 440 Pa. 150, 269 A. 2d 722 (1970). *See also United States v. Marson,* 408 F. 2d 644 (4th Cir. 1968). In exercising this discretion the judge should determine what effect, if any, violation of the order may have had in shaping the testimony the disobedient witness would offer. *Commonwealth v. Ross,* 190 Pa. Superior Ct. 145, 152 A. 2d 778 (1959). He should consider whether the witness actually heard others testify; whether the witness intentionally disobeyed the order so that he might hear others testify; whether the party calling the witness procured his disobedience; and whether the testimony heard was related to the witness's expected testimony in such a way that he could have been influenced by or gained knowledge from it. 2 Torcia, Wharton's Crim. Evid. §405 (13th ed. 1972); 14 A.L.R. 3d 16 (1967).

The trial judge here did not abuse his discretion in permitting the prosecutrix to testify after she had violated the order. It was not established what testimony the prosecutrix overheard. She stated on the stand in response to a question from appellant's attorney that she had entered the courtroom just as Ms. Hamilton was getting off the stand. There is no evidence that her disobedience of the judge's order was intentional. Dr. Green during her testimony used the

word "vagina" but not "penis"; thus her testimony cannot completely account for the prosecutrix's subsequent ability to use those words. Neither Dr. Green's nor Ms. Hamilton's testimony could have supplied the prosecutrix with the substance of her statement on the penetration issue.

Appellant, for the first time, argues that the trial judge should have noted for the jury the violation of the sequestration order and should have charged that the witness's disobedience could be considered as affecting her credibility. *Commonwealth v. Turner*, 389 Pa. 239, 133 A. 2d 187 (1957). We shall not consider this argument. Any objection to the omission of such a charge should have been made before the jury retired to deliberate. Pa. R. Crim. P. 1119(b). At the end of his charge, the judge afforded appellant's counsel an opportunity to discuss at side bar any instruction misstated or overlooked, but counsel made no request.

### The Commonwealth's Failure To Call Two Eyewitnesses

It appears from the testimony of the prosecutrix and Doris Hamilton that one Tony Underwood and one Stanley Mitchell were eyewitnesses to all or part of the attack.* Neither was called by the Commonwealth. Appellant's attorney requested that the trial judge charge the jury that it could infer that any witnesses known to the Commonwealth but not called would have given testimony unfavorable to the Commonwealth. *See Hertz Corp. v. Hardy*, 197 Pa. Superior Ct. 466, 473, 178 A. 2d 833, 837 (1962). The judge

---

* Appellant's brother was also present. Because of the possibility of interfering with the relationship between the brothers, and because the prosecutrix testified more fully upon being recalled, the Assistant District Attorney did not call appellant's brother. Appellant is not objecting to this.

correctly refused this request. "The calling of witnesses is within the discretion of the district attorney under the general direction of the trial judge. Com. v. Thurman, 167 Pa. Superior Ct. 642, 647, 76 A. 2d 483." *Commonwealth v. Lomax*, 196 Pa. Superior Ct. 5, 13, 173 A. 2d 710, 714 (1961). The district attorney is under no duty to call "eyewitnesses, if [he] believes after examination or investigation that their testimony is unreliable, or unworthy of belief, or surplusage or irrelevant." *Commonwealth v. Horn*, 395 Pa. 585, 589, 150 A. 2d 872, 874 (1959). One who apparently watched a crime but did nothing might be regarded as an unreliable witness. *See Commonwealth v. Campbell*, 196 Pa. Superior Ct. 380, 175 A. 2d 324 (1961) (women who voluntarily submitted to illegal abortions not called because of the possibility of unreliability). Moreover, the testimony of either Underwood or Mitchell would have been cumulative.

### The Offense of Attempted Statutory Rape

Appellant argues that he should not have been convicted of attempted statutory rape because no such crime existed in Pennsylvania.

At the time of appellant's arrest and trial (both of which occurred before the effective date of the new Crimes Code, 18 Pa.C.S. §§101 *et seq.* (1973)), the offense of statutory rape was defined as follows: "Whoever, being of the age of sixteen (16) years and upwards, unlawfully and carnally knows and abuses any woman child under the age of sixteen (16) years with her consent, is guilty of statutory rape, a felony." Act of Special Sess. No. 3, May 12, 1966, P. L. 84, §1, 18 P.S. §4720. There was no separate definition for the crime of attempted statutory rape. However, under the Act of June 24, 1939, P. L. 872, §1107, 18 P.S. §5107, where a jury found that "the defendant did not com-

plete the offense charged," it could render a verdict of "guilty of an attempt to commit the same." Thus, a defendant could be convicted of attempted statutory rape. *Commonwealth v. Kinner*, 137 Pa. Superior Ct. 256, 9 A. 2d 177 (1939); *Commonwealth v. Orris*, 136 Pa. Superior Ct. 137, 7 A. 2d 88 (1939).

Appellant points to the definition of the crime of assault with intent to ravish: "Whoever commits an assault and battery upon a female with intent forcibly and against her will, to have unlawful carnal knowledge of her, is guilty of a felony." Act of Special Sess., No. 3, May 12, 1966, P. L. 84, §1, 18 P.S. §4722. He argues that he should have been charged with this crime. However, the court found that the evidence of force was too weak to submit the charge of forcible rape to the jury, and this finding was not questioned by appellant.* Where an "assault" is consented to, the crime of assault with intent to ravish cannot be proved. Moreover, it has been held that even where there was no consent a conviction of attempted rape is nonetheless valid, although the penalty may not exceed that prescribed for assault and battery with intent to rav-

---

* Appellant argues that there was no proof of consent, and that therefore he could only have been charged with rape and (absent proof of penetration) only have been convicted of attempted rape. This argument misconceives the elements of the offense of statutory rape. Consent need not be established as an element of the offense; it must be proved only when a defendant by way of defense asserts that a conviction of fornication rather than statutory rape is in order. 18 P.S. §4721(b) (". . . if the jury shall find that such woman child was not of good repute, and that the carnal knowledge was with her consent, the defendant shall be acquitted of rape, and be convicted of fornication"); *see United States ex rel. Paris v. Brierley*, 315 F. Supp. 1392 (W.D. Pa. 1970). The offense of statutory rape was intended to penalize those having intercourse with females under sixteen whether or not they consent. Where it can be proved that the intercourse was forcible and against the girl's will, rape is the proper charge.

ish, since the two crimes are "essentially equivalent". *Commonwealth v. Friday,* 171 Pa. Superior Ct. 397, 90 A. 2d 856 (1952); *Commonwealth ex rel. DePoe v. Ashe,* 167 Pa. Superior Ct. 23, 74 A. 2d 767 (1950); *Commonwealth ex rel. Conrad v. Warden of Eastern State Penitentiary,* 165 Pa. Superior Ct. 374, 67 A. 2d 645 (1949); *Commonwealth ex rel. Cavalucci v. Smith,* 154 Pa. Superior Ct. 613, 36 A. 2d 732 (1944); *Commonwealth v. Moon,* 151 Pa. Superior Ct. 555, 30 A. 2d 704 (1943).

### Inconsistency in the Verdict

Appellant's final contention is that the jury in finding him guilty of both attempted statutory rape and indecent assault rendered an inconsistent verdict.

At the time of trial, "indecent assault" was "the taking by a man of indecent liberties with the person of a female without her consent and against her will, but with no intent to commit the crime of rape." *Commonwealth v. DeGrange,* 97 Pa. Superior Ct. 181, 185 (1929). Appellant contends that he could not have acted at one time both with and without an intent to have sexual intercourse with the prosecutrix. The Commonwealth, on the other hand, contends that appellant made two attacks on the prosecutrix, and that it is the first, which occurred in the living room when appellant embraced the prosecutrix and attempted to kiss her, that is the basis for the indecent assault verdict.

On defendant's appeal the evidence must be regarded in the light most favorable to the Commonwealth. *Commonwealth v. Simpson,* 436 Pa. 459, 463, 260 A. 2d 751, 754 (1970). So regarded, the evidence supports the Commonwealth's argument that the jury could have found that appellant made two attacks on the prosecutrix. The question therefore becomes whether the first attack was an "indecent assault".

Words and phrases that are not technical are to be construed "according to their common and approved usage." 1 Pa.S. §1903(a). Webster's Third New International Dictionary (1961) defines "indecent" as "not conforming to generally accepted standards of morality: tending toward or being in fact something generally viewed as morally indelicate, improper or offensive . . .," and defines "liberties" as "undue intimacy", "improper familiarity", "action which goes beyond the limits of prudence." In deciding whether indecent liberties have been taken, the victim's assessment of the contact must be considered. *Commonwealth v. Gregory*, 132 Pa. Superior Ct. 507, 513, 1 A. 2d 501, 503 (1938) (important whether contact caused shame or other disagreeable emotions in victim); *see also* 18 C.P. S.A. §3126 (1973) (indecent assault where one knows contact is offensive to the victim). Here the jury could have found from the prosecutrix's testimony that she found appellant's advances distasteful. In general, "[t]he common sense of [the] community, as well as the sense of decency, propriety and morality, which most people entertain, is sufficient to apply the statute to each particular case, and point out what particular conduct is rendered criminal by it." *State v. Millard*, 18 Vt. 574, 577 (1846). Given this standard, the jury's finding that appellant took indecent liberties with the prosecutrix will not be overturned.

The case is remanded for further proceedings consistent with this opinion.