Commonwealth *v.* Kaye, Appellant.

Argued April 10, 1974. Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*George E. Goldstein,* with him *Robert M. Rosenblum* and *William J. Honig,* and *Goldstein and Rosenblum,* for appellant.

*Joseph M. Stanichak,* Assistant District Attorney, with him *Joseph S. Walko,* District Attorney, for Commonwealth, appellee.

OPINION BY SPAETH, J., February 27, 1975:

Appellant, an osteopath, was convicted after a trial by jury of three offenses under the Drug, Device and Cosmetic Act:[1] trafficking in dangerous or narcotic drugs;[2] prescription to a person known to be a habitual user;[3] and prescription without a physical examination.[4]

On July 13, 1971, George Gariti went to appellant's office in Coraopolis, Allegheny County, and asked appellant to issue a prescription for Numorphan. This was a very potent pain killer, usually only prescribed for use by terminal cancer patients. Appellant refused to write the prescription unless Gariti could supply the name of such a patient. Gariti called a friend, Kathy Markvan, whom he knew to have a relative whose name he could use. She gave him the name of her aunt. He wrote the name on a piece of paper, which he handed to appellant, and appellant wrote out the prescription and handed it to him. Gariti and Markvan then went to have the prescription filled in Ellwood City, where the aunt lived.

---

1. Act of Sept. 26, 1961, P.L. 1664, §1 *et seq.,* 35 P.S. §780-1 *et seq.* (Repealed; Act of April 14, 1972, P.L. 233, No. 64, §43 (effective June 14, 1972)).

2. Drug, Device and Cosmetic Act, supra, §4(q), 35 P.S. §780-4(q).

3. *Id.,* §4(v), 35 P.S. §780-4(v).

4. *Id.,* §4(w), 35 P.S. §780-4(w).

They got lost, however, and ended up trying to have the prescription filled at a pharmacy in Zelienople. Markvan went in to get the prescription filled while Gariti waited in the car. The pharmacist noticed that the prescription lacked the proper registration number from the Bureau of Narcotics and Dangerous Drugs. His suspicions were further aroused by the fact that the production of Numorphan had been halted six months before by the government, although pharmacists were permitted to sell any they still had in stock. He alerted an off-duty policeman who happened to be in the pharmacy, and Markvan and Gariti were taken into custody. The Commonwealth proved these events by the testimony of all of the persons involved (except appellant).

Albert D'Amico, a regional supervisor with the Pennsylvania Bureau of Narcotics and Drug Control, supervised the investigation of appellant. Acting on information he received from Gariti and Ron Lupinacci, he dispatched Agents Burke and Roy to various pharmacies in the general area of Ambridge, Beaver County, to inspect and search for prescriptions written by appellant and issued to Gariti and Lupinacci, in both their actual names and their several aliases. This investigation yielded at least thirty-seven illegal prescriptions written over a period of about sixteen months: two for Numorphan (the second having been issued in the name of a dead man), twenty-six for Desoxyn, three for Nembutal, four for Desbutal, one for Dilaudid, and one for Quaalude.[5] D'Amico, Burke, and Roy testified as to the manner in which the investigation and inspection were conducted,

---

5. Altogether there were forty Commonwealth exhibits, of which thirty-eight were prescriptions and two confirmed that one of the Numorphan prescriptions had been issued in the name of a dead man. One of the prescriptions, Exhibit 17, was never identified, although it was admitted into evidence without objection. This accounts for the missing thirty-eighth prescription in our account.

and they identified the prescriptions and the pharmacies from which they were seized. In addition, the pharmacists who filled or supervised the filling of the various prescriptions identified the prescriptions; and some of the pharmacists also testified as to the manner in which the inspection was conducted.

Gariti, Lupinacci, and Dennis Maher had all bought prescriptions for various drugs, principally Desoxyn, from appellant at his office in Ambridge. Lupinacci and Maher testified about a time span beginning in 1968; Gariti testified that he bought prescriptions continuously from February, 1971. Each said he paid $5.00 or $6.00 for each prescription, and that appellant never gave a physical examination in connection with any of the prescriptions. Lupinacci testified that during one period he was buying as many as six or seven prescriptions a week; Gariti testified that sometimes he would buy as many as three or four a week. In addition, Gariti testified that appellant sold him prescriptions for morphine on a regular basis, although no such prescriptions were introduced in evidence.

Several secretary-assistants who worked for appellant during the period in question testified that Gariti and Lupinacci often came to see appellant, and that appellant handed them folded pieces of paper that appeared to come from his prescription pad. They also said it was their duty to keep certain records on every patient and prescription and to aid appellant when he conducted a physical examination, but that none of these procedures was followed here.

As part of his defense, appellant took the stand and denied ever issuing any illegal prescription to Gariti or Lupinacci. He also presented witnesses whose testimony was intended to impeach the credibility of the Commonwealth's witnesses. Testimony was also presented that his offices had been burglarized and that prescription pads could have been stolen.

Appellant has raised several issues on this appeal, but the only ones that will be considered are the three that were raised in the court below.[6]

Appellant contends that a new trial should be granted because, in his words, "there is gross conflict between material witnesses as to essential facts upon which [appellant's] guilt is based, indicating the strong possibility of perjury . . ."[7] This contention is based on the fact that if Gariti and Lupinacci are to be believed, they must have received many more prescriptions than the thirty eight[8] introduced at the trial. Since Agent Burke testified that

6. No charge was requested on the impact of certain violations of the court's sequestration order; any error in the charge is thus waived. Pa. R. Crim. P. 1119(b). Appellant argues in his brief that some of the alleged prescriptions did not meet certain federal requirements and thus should not have been filled. This issue was not raised at trial nor in post-trial motions, and appellant is thus estopped to raise it on direct appeal. *Commonwealth v. Agie*, 449 Pa. 187, 296 A.2d 741 (1972). He also argues that he was not adequately represented by counsel in that he failed to raise certain issues and objections. "Effective assistance of counsel is denied if an independent examination of the record leads to the conclusion that the particular course chosen by counsel had no reasonable basis designed to effectuate his client's interests." *Commonwealth v. Wideman*, 453 Pa. 119, 123, 306 A.2d 894, 896 (1973). We do not believe the record in the present case bears out appellant's contention that counsel's actions had "no reasonable basis" or that he was otherwise inadequate. It appears that defense counsel did an admirable job in the face of overwhelming evidence. If a further record could substantiate appellant's claim, it will have to be developed pursuant to petition for a post-conviction hearing.

7. The Commonwealth correctly points out that this argument was not specifically articulated in appellant's post-trial motions. Appellant did argue, however, that there was insufficient evidence to support the verdict and that the verdict was contrary to the weight of the evidence. Without deciding whether appellant should technically be estopped, we shall give him the benefit of the doubt and reach his argument, thus finally deciding it.

8. Both appellant and the Commonwealth have used the number thirty-nine, which is not in accordance with the record.

all of the prescriptions that the investigation turned up were introduced at trial, the argument goes, somebody must have been lying, and a new trial should be granted.

Appellant cites no cases where perjury was found obvious on the face of the record, and independent research has revealed none. However, even when a witness has recanted testimony under oath, an appellate court will not interfere with an order refusing a new trial unless there has been a plain abuse of discretion. *Commonwealth v. Mosteller*, 446 Pa. 83, 284 A.2d 786 (1971) ; *Commonwealth v. Coleman*, 438 Pa. 373, 264 A.2d 649 (1970) ; *Commonwealth v. Fernandez*, 232 Pa. Superior Ct. 19, 332 A.2d 819 (1974) ; *Commonwealth v. Osborn*, 223 Pa. Superior Ct. 523, 302 A.2d 395 (1973) ; *Commonwealth v. Sholder*, 201 Pa. Superior Ct. 642, 193 A.2d 632 (1963). If a reversal is not automatic after a sworn recantation, it is certainly not so when there is only a possibility of perjury, for that possibility always exists. In any case, the premise of appellant's argument fails, for there is not the inconsistency in the testimony he says there is. Agent Burke never said that he had seized every prescription written by appellant, but only those with certain names filled at certain pharmacies. Some of the prescriptions may have been under other aliases or filled at other pharmacies. Thus there is not the "incontrovertible evidence" that the appellant's brief claims that either Burke or Gariti lied.

Appellant also contends that when the court's sequestration order was violated, his requests for a mistrial should have been granted.

Sequestration is a matter within the sound discretion of the trial judge. *Commonwealth v. Turner*, 371 Pa. 417, 88 A.2d 915 (1952). Once made, a sequestration order, like any order of the court, should be diligently enforced. This is not to say, however, that a violation of the order will automatically result in a mistrial.

"It is within the sound discretion of the trial judge to permit a witness who has violated a sequestration order to testify. *Commonwealth v. Martin,* 440 Pa. 150, 269 A.2d 722 (1970). *See also United States v. Marson,* 408 F.2d 644 (4th Cir. 1968). In exercising this discretion the judge should determine what effect, if any, violation of the order may have had in shaping the testimony the disobedient witness would offer. *Commonwealth v. Ross,* 190 Pa. Superior Ct. 145, 152 A.2d 778 (1959). He should consider whether the witness actually heard others testify; whether the witness intentionally disobeyed the order so that he might hear others testify; whether the party calling the witness procured his disobedience; and whether the testimony heard was related to the witness's expected testimony in such a way that he could have been influenced by or gained knowledge from it. 2 Torcia, Wharton's Crim. Evid. §405 (13th ed. 1972) ; 14 A.L.R. 3d 16 (1967) ."

*Commonwealth v. Smith,* 227 Pa. Superior Ct. 355, 372, 324 A.2d 483, 492 (1974) (prosecutrix in rape case allowed to be recalled even though she had heard two witnesses testify and had had lunch with Commonwealth's attorney).

The first violation of the sequestration order involved D'Amico and Burke. D'Amico testified first; he was followed by Burke, whose testimony was interrupted by the lunch beak. After lunch appellant's counsel moved for a mistrial, stating, "Upon my leaving the Court Room, I witnessed Mr. Burke, Mr. Neish [the Commonwealth's attorney] and Mr. D'Amico standing together with the file that I believe Mr. Burke has in his hand now discussing something. I couldn't hear what they were saying."[9]

---

9. No further inquiry into just what happened was made by the trial judge. The better practice is at once to hold a hearing away from the jury to determine if the order has indeed been violated and to what extent.

We do not find this to be such a violation of the sequestration order as to require a mistrial. Burke did not hear D'Amico's testimony; the suspicious meeting took place outside the courtroom. More important, however, is the fact that D'Amico and Burke testified to substantially different matters. D'Amico testified as to the investigation in general and how he got the leads from his informers. He also described and identified the exhibits and the effects of the drugs the prescriptions were for. Burke, on the other hand, testified mainly to the manner in which each pharmacy's prescription files were inspected, the names he was looking for, and the way the prescriptions were labeled when they were discovered. All he did after the lunch break was to identify some of the prescriptions. It is true that D'Amico had already done this, but all the process amounted to was to read each prescription and identify the markings on it. This is not the kind of testimony that would be "shaped" or "colored" by the testimony of another.

The second violation of the sequestration order also occurred during the lunch break and involved Gariti. The following Commonwealth witnesses had already testified: D'Amico, Burke, George Fishburn (the pharmacist who spotted the Numorphan prescription), Francis Johnson (Chief of the Zelienople police, who arrested Markvan and Gariti at Fishburn's pharmacy), Louis Pizer (a Zelienople police officer called to assist Johnson; part of the chain of custody of the Numorphan prescription), Lupinacci, Bernard Sherrin (a pharmacist who filled some of the prescriptions), and Dennis Maher. Gariti had already given most of his direct testimony. It was about the manner in which he had met appellant and obtained prescriptions from him, and it corroborated the testimony of Lupinacci and Maher, the other two informers. Counsel for appellant moved for a mistrial, claiming that he had seen Gariti "in conference" with Lupinacci and Maher and that "They went to lunch together." He also

claimed to see Buelah Burgess, a later Commonwealth witness, conferring with Lupinacci and Maher.[10]

Neither Gariti nor Burgess heard any of Lupinacci's or Maher's testimony. Further, at the time the violation of the sequestration order took place Gariti had already given the testimony that depended for its credibility on its consistency with Lupinacci's and Maher's (*i.e.*, his relationship with them, how they met the doctor, and how they obtained prescriptions; he had also already testified that he had never received a physical examination in connection with any of the prescriptions he purchased). After the violation Gariti identified the prescriptions that he had purchased, which neither Lupinacci nor Maher had done, and he testified that appellant had prescribed morphine for him on a regular basis. Except for a few questions, his cross-examination dealt only with his own experiences, independent of Lupinacci's and Maher's. It is thus improbable that any of Gariti's testimony was a result of the violation of the sequestration order. *Compare Commonwealth v. Turner,* 389 Pa. 239, 133 A.2d 187 (1957) (vital to Commonwealth's case that testimony of two police officers concerning the same event coincide).

---

10. Again there was no determination of the extent and impact of the violation of the sequestration order, although it is apparent from the record that there was indeed a violation:

THE COURT: The motion is denied. Can't you understand that, Clarence [the Commonwealth's attorney]? Can't you tell these people?

MR. NEISH: Your Honor, I told them.

THE COURT: You want me to declare a mistrial?

MR. NEISH: I don't want you to declare a mistrial.

THE COURT: Keep them segregated. Put a County Detective on each one of them. These Pittsburgh lawyers think everybody is cheating. Motion is denied. An exception is noted to the Defendant.

In view of this colloquy it is difficult to understand the statement in the lower court's opinion that ". . . the record does not indicate any violation of the Court's sequestering order." Slip opinion at 10.

The same may be said of Burgess's testimony, which came later in the trial. She had worked for appellant as a secretary/nurse and was one of the witnesses who testified about appellant's failure to keep records (about which neither Lupinacci nor Maher had testified). She also testified that to the best of her knowledge no physical examination was performed before a prescription was written for any of the informers. On cross-examination she admitted that she could not say for sure that appellant had not indeed examined the informers without her assistance. The part of her testimony that overlapped Lupinacci's and Maher's (*i.e.*, that regarding lack of physical examinations) was thus of little value to the Commonwealth's case, as those with superior knowledge of the fact had already testified unequivocally that none took place.

The third objection regarding the sequestration order came near the end of the Commonwealth's case. Lupinacci, who had heard some of the other witnesses' testimony after his was completed, was recalled to the stand to testify whether he had purchased the prescriptions at appellant's Allegheny County or Beaver County office. (Gariti was also recalled for this purpose, but he apparently had not heard any other witness's testimony.) Since none of the other witnesses testified on this point, and since Lupinacci when recalled did not testify on any other point, there is no way that any other witness's testimony coud have influenced his. The objection was therefore properly overruled.

The only other issue with which we must deal is whether the trial court erred in denying a continuance in order to allow defense counsel to prepare for trial. Counsel told Judge REED just before the trial, which started on June 6, 1972, that he had not been retained until June 1, 1972. Judge REED's opinion, supported by the record, casts serious doubt on the truth of this statement:

The chronological history establishes that Attorney Copetas who presented the Motion to Continue, is the same attorney who witnessed Defendant's Affidavit of Rights dated February 1, 1972—he was the same attorney who represented defendant at the preliminary hearing on March 9, 1972, which was 85 days before the Motion to Continue was presented. The history also shows defendant was advised of his need to employ counsel and on several occasions was advised to be prepared for trial beginning June 5, 1972—that on his arraignment on May 19, 1972 (14 days before the trial date) he told Judge SAWYER Attorney Copetas of Pittsburgh was representing him. '

On this statement of the record, no real legal issue is presented.

The judgment of sentence is affirmed.