450 A.2d 15

**COMMONWEALTH of Pennsylvania**

v.

**Charles EDWARD, a/k/a Charles Edwards, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 9, 1981.

Filed Aug. 20, 1982.

Margaret M. Boyce, Philadelphia, for appellant.

Jane C. Greenspan, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

Before SPAETH, MONTGOMERY and LIPEZ, JJ.

SPAETH, Judge:

This appeal is from the revocation of appellant's probation and the imposition of a sentence of imprisonment. We have concluded that the lower court properly revoked probation but that the case must be remanded for further evidence on whether appellant should be sentenced to prison or involuntarily committed to a mental institution.

This case began in September 1977, when seventy year old William Mulvenna was walking west on John F. Kennedy Boulevard in Philadelphia. Appellant walked up to Mr. Mulvenna and violently shoved him against a plate glass window, causing him to fall to the ground. As Mr. Mulvenna fell, appellant took his wallet and fled. The entire incident was witnessed by a police officer, who arrested appellant.

Appellant was tried for robbery and a jury found him guilty. Because he had a history of mental illness he was committed to Philadelphia State Hospital for a mental evaluation pending disposition of post-trial motions. In April 1978 post-trial motions were denied and appellant was recommitted for further evaluation. On July 31, 1978, appellant was sentenced to "five years probation; immediate parole granted; civil commitment to Philadelphia State Hospital for a period of up to ninety days." Slip op. at 4.

Appellant was discharged from the hospital on October 6, 1978, and ordered to report regularly to his probation officer and to attend a community mental health facility five days a week for out-patient treatment. By February 1979 appellant was in technical violation of his probation, and in September 1979 he was arrested on charges of terroristic threats and indecent exposure. After pleading guilty to these charges, appellant was again placed on probation.

Shortly after being released on probation for the second time appellant was again in technical violation by virtue of his repeated failure to report to his probation officer and to keep him informed of changes in address. Wanted cards were prepared, but appellant was permitted to remain at large.

Appellant next came to the probation officer in February 1980 without an appointment. He was rambling and disoriented, and wore a blond wig. He masturbated in front of a secretary and was found nude in the men's room. He was taken to an out-patient psychiatric center, from which he was released when arrangements were made for him to live at a boarding home.

On March 10, 1980, the probation department was notified that appellant had sexually assaulted a resident at the boarding home. Appellant fled the boarding home and wanted cards were prepared. On May 2, 1980, appellant was arrested. After two hearings, on July 8 and October 1, 1980, the lower court revoked appellant's probation and sentenced him to one and a half to five years in prison. It is from this judgment of sentence that appellant has appealed.

██ Appellant argues (1) that he was incompetent to participate in the probation revocation hearing; (2) that his probation was improperly revoked because his violations were non-willful; and (3) that in light of his continuing mental illness, the lower court should have committed him to a hospital for treatment rather than sentencing him to prison.[1]

-1-

██ According to the Mental Health Procedures Act of 1976, 50 P.S. 7101 *et seq.,*

> Whenever a person who has been charged with a crime is found to be substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense, he shall be deemed incompetent

---

1. Appellant also argues that his trial counsel was ineffective for failing to request a competency hearing prior to trial. This issue may not be raised on appeal from revocation of probation. Appellant has made other arguments, which we might hold waived because appellant failed to include them in his statement of issues complained of as required by Pa.R.A.P. 1925, but which we shall nevertheless dispose of. Appellant argues that his probation revocation hearing counsel was ineffective for failing to request a competency hearing prior to the revocation hearing. Since the lower court had already ordered psychiatric evaluations, and had concluded on the basis of these that appellant was competent to participate in the hearing, requesting a competency hearing would have been an exercise in futility that counsel was not ineffective for failing to indulge in. *See, Commonwealth v. O'Brien,* 273 Pa.Superior Ct. 198, 417 A.2d 236 (1979) (Trial court that had psychiatric evaluation stating that defendant was competent to stand trial had sufficient evidence to disregard defendant's assertions to the contrary).

 Appellant also argues that hearing counsel was ineffective for failing to object to hearsay testimony. Although hearsay testimony concerning an alleged sexual assault was admitted, the lower court specifically noted that it did not consider this testimony in making its decision. The admission of this testimony was therefore at most harmless error.

 Finally, appellant argues that he was denied his right to a speedy probation revocation hearing when this hearing was delayed five months after his arrest. However, the delay was caused by appellant's repeated psychiatric evaluations and therefore was not unreasonable. *See, Commonwealth v. Long,* 264 Pa.Superior Ct. 465, 400 A.2d 179 (1979); *Commonwealth v. Williams,* 254 Pa.Superior Ct. 202, 385 A.2d 979 (1978).

to be tried, convicted or sentenced so long as such incapacity continues.

50 P.S. § 7402(a).

Here, the lower court specifically found appellant competent to participate in the probation revocation hearing:

> On October 1, 1980, when the Court finally revoked probation the defendant was not incompetent, as now alleged by the Defender Association. Dr. Camiel had testified that the defendant was no longer in need of hospitalization. The Defendant addressed the Court. He clearly understood the nature of the proceedings and the possible consequences. The mere fact that the defendant denied his illness and opposed Mr. Larrabee's proposal for continued out-patient medical treatment did not render him incompetent so as to invalidate the revocation proceedings.

Slip op. at 12.

The decision as to appellant's competency was within the discretion of the lower court. *Commonwealth v. Knight*, 276 Pa.Superior Ct. 348, 419 A.2d 492 (1980). In exercising its discretion to decide competency, however, a court must enter upon a careful and complete inquiry, and its decision should be an informed one based on the evidence. *Commonwealth v. Smith*, 227 Pa.Superior Ct. 355, 324 A.2d 483 (1974), *citing United States v. Crosby*, 149 App.D.C. 306, 462 F.2d 1201 (D.C.Cir.1972). Where the decision is not based on proper or sufficient evidence we will order the case remanded so that the court may make an informed decision. *See, Commonwealth v. Marshall*, 456 Pa. 313, 318 A.2d 724 (1974).

■ In addition to the opportunity to observe appellant, the lower court's determination of appellant's competency was evidently based on the evaluation of appellant by Dr. Camiel, a court-appointed psychiatrist. Unfortunately, Dr. Camiel's report was not included in the record as transmit-

ted to us.[2] He did, however, testify at the probation revocation hearing.

Dr. Camiel testified that appellant was suffering from a serious mental illness but had responded well to psychotropic drugs, and with proper treatment, might be able to function independently in society. N.T. 10/1/80, 8. The doctor did not know whether, when he saw appellant, appellant was taking medication, but he said his diagnosis would have been unaffected:

Q. Would it have been important to know, Doctor, in making your evaluation, based upon the interview, whether or not at the time of the interview he was, in fact under medication?

A. No, I don't think so, because I think that my conclusions were I didn't feel that he was—that he needed acute hospitalization at that time. There was some strange things about him. He did need acute hospitalization, and the recommendation, I think, basically was based on the history of refusal to take medications in the past and his stated objection or refusing medication in the future, when he was released.

So, I don't think whether or not he was on medication at that time was critical because I didn't find him floridly psychotic.

N.T. 10/1/80, 13–14.

In the course of describing appellant's mental condition, Dr. Camiel testified that "[his] considered medical opinion is that [appellant] rapidly cycles through periods of psychosis, craziness, interspersed with periods of relative normality." N.T. 10/1/80, 9. He further testified that

. . . I think [appellant's] history is such that while basically he is always a little bit strange, there are times when he clearly loses all contact with reality, sometimes becomes violent, sometimes is just unable to maintain himself and

2. This omission is somewhat frustrating because just 4 months prior to the probation revocation hearing, Dr. Camiel had found appellant so disturbed as to be civilly commitable under §§ 304 and 405 of the Mental Health Procedures Act of 1976, 50 PS §§ 7304 and 7405. N.T. 7/8/80, 23.

at those times he would require the acute hospitalization that we talked about before which I think again would be brief, because at that point he would probably accept medications for a limited period of time, be able to regain enough of control of himself to be able to be placed back in the general prison population, but I do think he will cycle through psychotic periods again and again, yes. N.T. 10/8/80, 18.

We have considerable doubt whether this sort of testimony represents evidence sufficient to support the lower court's finding that when appellant's probation was revoked, appellant "was not incompetent . . . [and] no longer in need of hospitalization." Our doubt, moreover, is not dispelled but is rather strengthened by the evidence that Dr. Camiel's diagnosis of appellant's condition conflicted with that of another court-appointed psychiatrist, Dr. Boxer. Although Dr. Boxer's report was also not included in the record as transmitted to us, the lower court stated the report's conclusion in its opinion:

A report dated August 6, 1980 was prepared by Dr. Arthur D. Boxer. Dr. Boxer mistakenly evaluated the defendant's competency to stand trial. Dr. Boxer reported that during the interview, the defendant was agitated, but in control of his behavior. He refused to discuss possible penalties if "convicted." Dr. Boxer concluded that the defendant was in "partial remission without medication . . . .," but that ". . . he is not considered able to communicate with his counsel in his own defense because of his adamant refusal to consider all possibilities of charges lodged against him."

Slip op. at 7.

The court goes on to state that this report was considered at a hearing held on September 17, 1980, but that the court then ordered a further psychiatric examination of appellant to determine "whether it was appropriate to commit [appellant] as a probation violator." Slip op. at 8. The court offers no explanation of its decision to reject Dr. Boxer's findings that appellant was incompetent to stand trial. The

court's rejection of Dr. Boxer's opinion is somewhat puzzling given appellant's aberrant behavior during the September hearing, when appellant apparently tried to attack the judge. As the lower court recounted the incident to appellant's counsel at the final revocation hearing on October 1, 1980:

> ... As a matter of fact, at the last hearing here, which occurred on September 17, in this courtroom, this Court, at great length, spoke with the defendant. His answer seemed responsive, he appeared to be cooperative, and then he went off the deep end, so to speak, and became disruptive. You weren't here, but I recall it very well. I recall it very well.
>
> To the point where it required two sheriffs to restrain him, when he found out he wasn't going to be released right then and there . . . .

N.T. 10/1/80, 40–42.

While this attack does not by itself demonstrate appellant's inability to participate in the revocation hearing, it does support Dr. Boxer's evaluation of appellant.

The lower court's finding that appellant was competent to participate in the revocation hearing is further undercut by the statement by counsel, during the first revocation hearing, on July 8, 1980:

> I spent a bit of time speaking to Mr. Edwards, and what's set forth in the psychiatric evaluation appears to me to be accurate. I don't think that Mr. Edwards even now, a month later, a month after being in the House of Correction, and he is in the general population, I don't believe he now fully understands what's going on or is fully able to cooperate with me.

N.T. 7/1/80, 15.

Although this statement was made during the first hearing, appellant's conduct during the final hearing on October 1, suggests that counsel still was unable to communicate with his client. For example, when asked about appellant's version of events leading up to the revocation hearing, counsel replied:

464

THE COURT: Mr. Larrabee, does Mr. Edwards agree with the report or does he deny it?

MR. LARRABEE: Does he agree with the doctor's report?

THE COURT: No. The hearing summary? Have you discussed it with him?

MR. LARRABEE: No, sir, I haven't.

THE COURT: Discuss it with him, please. If he controverts those matters set forth there, it may be necessary for the Court to call in the witnesses.

MR. LARRABEE: The report, as near as I can determine, is admitted in part and denied in part.

THE COURT: What is admitted and what's denied?

MR. LARRABEE: Mr. Edwards admits that he reported to the office on the 19th, along with that he was given 50 cents carfare, that he was seen masturbating in the office and nude in the men's room, but he denies the March 10th incident that is reported here as a sexual assault.

I think the denial goes to the specific term "sexual assault."

THE COURT: What is it, if anything? What was the nature of the incident?

MR. LARRABEE: Your Honor, that's difficult to tell, but it's not a sexual assault. I don't want to put words in his mouth.

THE COURT: At least he denies it's a sexual assault.

MR. LARRABEE: Yes, sir.

MR. CARPENTER: Does he deny the sexual part or the assault part?

MR. LARRABEE: As near as I could determine, the assault part.

N.T. 10/1/80, 30–31.

Appellant's conduct at the conclusion of the hearing further indicated an inability to cooperate with counsel. After the lower court found that appellant had violated his probation, and had sentenced him to one and a half to five years in prison, N.T. 10/1/80, 49, appellant stated that he had a

question. *Id.* at 50. When the court asked what he wanted explained, appellant replied, "What was the violation? What was the violation?" *Id.* at 51. The court replied that the violation was

> failure to keep in touch with your probation officer, changing your address without notifying your probation officer; for appearing nude, at the probation office, on February 19, 1980; upon exposing yourself and proceeding to masturbate in front of the secretary, in the probation office; that's the violation that the Court has found.
> *Id.*

Appellant responded by arguing with the court, in a quite incoherent way, ending with the statement, "I feel that the Court is not only going to get an appeal but a lawsuit." *Id.* at 53. The court thereupon declared a recess, after which, without appellant being present, it said to counsel:

> I am hopeful that this incarceration may straighten him out, but I have my doubts, frankly, but we can't let this fellow run loose. I don't think I could commit him as a mental patient, with an involuntary commitment, I don't think there is enough for that, but on the other hand I think this person is a danger, I really do.
> *Id.*

Thus, the record reflects inconsistent at least, if not conflicting, psychiatric evidence, erratic behavior by appellant, and an expression of uncertainty by the lower court. Nevertheless, we have concluded that we should not disturb the lower court's finding that appellant was competent to participate in the probation revocation hearing. The lower court judge is an experienced judge, who plainly considered the case conscientiously. He knew appellant from appellant's past appearances before him, and he had the advantage, which we do not have, of seeing appellant. Moreover, as we shall later discuss, it is necessary to remand the case for resentencing, and on remand, the record may be brought up-to-date, and, we may hope, more helpful psychiatric evaluations presented.

–2–

To some extent appellants' argument that his probation was improperly revoked because his violations were non-wilful overlaps his argument that he was incompetent to participate in the probation revocation hearing. Distinct issues are presented, however.

 Whether probation may be revoked for less than wilful conduct is an open question. *Commonwealth v. Del Conte,* 277 Pa.Superior Ct. 296, 419 A.2d 780 (1980); *Commonwealth v. Holm,* 233 Pa.Superior Ct. 281, 335 A.2d 713 (1975); *Commonwealth v. Rooney,* 233 Pa.Superior Ct. 225, 335 A.2d 710 (1975). In those cases in which we have affirmed revocation for technical violations, we have found clear evidence of wilful conduct. *See, Commonwealth v. Holm, supra; Commonwealth v. Rooney, supra.* In this case, however, we have concluded that we do not have to decide the question, for appellant's technical violations were in themselves sufficient to support a finding that probation was not serving its rehabilitative purpose.

The terms of appellant's probation required that he report regularly to his probation officer and attend a community mental health facility five days a week for out-patient treatment. Within three months of the imposition of probation, appellant refused to continue treatment at the mental health facility, and despite occasional returns to the clinic, refused to participate in the treatment program on a regular basis. As the lower court found:

> ... the defendant totally refused to cooperate in the probation process. Though his bizarre and sometimes criminal behavior while on probation may have been the function of his mental illness for which the defendant should not be held accountable, this acute illness was precipitated by his refusal to cooperate with his probation officers and continue out-patient psychiatric treatment and take required medication.

Slip op. at 12.

During the revocation hearing, appellant made plain to the court that he did not consider himself to be in need of treatment, *see, e.g.,* N.T. 10/1/80, 46–48, and he adamantly refused to accept medication. Accordingly, there seems little possibility that if returned to probation, he would comply with its terms. In these circumstances we do not believe that the lower court abused its discretion in revoking appellant's probation.

–3–

■■■■ We have already quoted, page 20, *supra,* the lower court's reason for sentencing appellant to prison: on the one hand, the court regarded appellant as "a danger" who should not be allowed "[to] run loose;" on the other hand, the court did not believe "there is enough [evidence]" to entitle it "[to] commit him as a mental patient, with an involuntary commitment." N.T. 10/1/80, 53. The record amply supports the lower court's finding that appellant is a danger, and that he requires some sort of confinement. The issue remains, however, whether it supports the court's finding that confinement should be in prison instead of a mental institution.

> The Mental Health Act of 1976 provides, in part, that Whenever a person who is charged with crime, or who is undergoing sentence, is or becomes severely mentally disabled, proceedings may be instituted for examination and treatment under the civil provisions of this act in the same manner as if he were not so charged or sentenced . . . . 50 P.S. § 7401(a).

The civil provisions thus referred to provide, in part, that

> Whenever a person is severely mentally disabled and in need of immediate treatment, he may be made subject to involuntary emergency examination and treatment. A person is severely mentally disabled when, as a result of mental illness, his capacity to exercise self-control, judgment and discretion in the conduct of his affairs and social relations or to care for his own personal needs is so lessened that he poses a clear and present danger of harm to others or to himself.

50 P.S. § 7301(a).

Some one "poses a clear and present danger" to himself when, among other things,

> the person has acted in such manner as to evidence that he would be unable, without care, supervision and the continued assistance of others, to satisfy his need for nourishment, personal or medical care, shelter, or self-protection and safety, and that there is a reasonable probability that death, serious bodily injury or serious physical debilitation would ensue within 30 days unless adequate treatment were afforded under this act. . . .

50 P.S. § 7301(b)(2)(i).

It seems clear to us from the record of the probation revocation hearings that appellant does in fact pose a clear and present danger of harm to himself in that he is unable to satisfy his need for nourishment, medical care, shelter and self-protection. At the hearing held July 8, 1980, for example, appellant testified concerning the shelter that had been arranged for him by his probation officer:

> THE COURT: When he got a place for you to stay at, why didn't you stay there?
>
> THE DEFENDANT: I don't remember a place to stay.
>
> THE COURT: What is that?
>
> THE DEFENDANT: I didn't remember a place to stay.
>
> THE COURT: Didn't he send you to the Salvation Army office?
>
> THE DEFENDANT: I stayed there a few times, right. They put me out for some reason. I think I came in after 11 o'clock at night and I couldn't get in after 11 o'clock at night. So they put me back on the streets.
>
> THE COURT: Did you go back and talk to Mr. Hall?
>
> THE DEFENDANT: Yeah.
>
> THE COURT: When?
>
> THE DEFENDANT: The next time I got a chance I went back, because I was so tired and sleepy.
>
> I was walking around in a daze, you know. I was sleeping on the subways. Fifty cent a night and I would ride the subway back and forth all night long.

THE COURT: Do you know anything about this, Mr. Ha..?

MR. HALL: I believe what he is saying, he sleeps on subways, he has nowhere to live.

N.T. 7/8/80, 27–28.

Appellant repeated essentially the same testimony at the hearing held October 1, 1980, when he told the court:

I don't have any place to live at, you know.

It's just like I feel like an animal at times, from the environment. Never a roof over my head.

I'm trying to say if there is anything that's wrong, it's that I'm not being treated fairly, that makes me act the way I do.

N.T. 10/1/80, 45.

Appellant's probation officer testified that, to the contrary, arrangements had been made for appellant "to be housed at the Salvation Army. He left there without leaving a forwarding address." N.T. 7/8/80, 14. Appellant also testified that his initial offense, assaulting and robbing an elderly man, had been economically motivated:

What I'm saying is, I don't want the Court to feel as though I need medicine, you know, for my mental health. I have never killed anybody or anything like that, and I have to take medicine because a hungry person will steal? That's why I was robbing for, to eat, and I stole money, right, and I did time for it, and I got on probation; and then the Court says after I got out of jail for that, I got to take medicine, just like I'm sick. I was hungry, so I stole some money. Do you want me to do the same thing again?

N.T. 10/1/80, 47.

Appellant's and his probation officer's testimony seems to comport perfectly with the lower court's evaluation of appellant as

a penniless and homeless young man, above average in intelligence, but mentally ill and sometimes acutely schizophrenic. When he is reasonably well, he exhibits antiso-

cial tendancies [*sic*] and poses somewhat of a threat to society, but when he is psychotic, he is dangerous and should not be out on the streets.

Slip op. at 11.

The question therefore arises, Why did the court believe it did not have enough evidence to commit appellant involuntarily, and that its only alternative was to imprison him?

The answer to this question is that Dr. Camiel testified that in his opinion, appellant was not commitable. Specifically, he said:

> As I indicated, Your Honor, Mr. Edwards is not mentally ill enough to require acute hospitalization, but I think he is sick enough to be transferred to a mental hospital, that that would be appropriate.
>
> . . . .
>
> If he wishes to sign himself into a hospital voluntarily, I think that he does manifest enough symptoms of mental illness that he could benefit from treatment on a voluntary basis.

N.T. 10/1/80, 54.

(Earlier, the doctor explained that by "acute hospitalization" he meant an involuntary commitment. *Id.,* 14.)

However, we find ourselves unable to accept Dr. Camiel's opinion as persuasive, given his other testimony. Dr. Camiel gave no explanation of how appellant's mental condition had changed between June, when, on his advice, appellant was involuntarily committed, and October. *See* footnote 2, *supra.* Second, although Dr. Camiel found in October that appellant could only be committed on a voluntary basis, he nevertheless recommended that appellant be placed in a "structured environment:"

> . . . . When he refuses medication he shows a history of becoming psychotic and when he becomes psychotic, he does act out in an indiscriminate way, and I think that the pattern indicates that there is a—that he is a greater than average risk of repeating such behavior, if he is not placed in a structured environment, whereby he can be under

close supervision and at which time he tends to respond favorable.

He seems to do better in a structured environment, whether it be a hospital or a prison, than he does on the outside.

Q. What would your recommendation be with respect to whether or not Mr. Edwards should be placed in a structured environment?

A. I think that at the present time, I think it's necessary that he be placed in a structured environment, as he seems to indicate that he has no knowledge that his behavior is aberrant and really doesn't seem to care.

N.T. 10/1/80, 10–11.

Appellant has not persuaded us that the lower court should have committed him to a hospital for treatment.[3] But he has persuaded us that the record is insufficient to support the lower court's decision that the appropriate "structural environment" in which he should be placed is a prison.

It is settled that in imposing sentence,

[t]he court must consider the character of the defendant and the particular circumstances of the offense in light of the legislative guidelines for sentencing, and must impose a sentence that is the minimum sentence consistent with the protection of the public, the gravity of the offense, and the rehabilitative needs of the defendant.

*Commonwealth v. Wicks,* 265 Pa.Superior Ct. 305, 310, 401 A.2d 1223, 1225 (1979) (collecting cases).

Here the record makes plain that the lower court considered appellant's character ("a penniless and homeless young man, above average in intelligence, but mentally ill and sometimes acutely schizophrenic [who] . . . when . . . psychotic

**3.** There appears some tension between appellant's brief, which argues that appellant is "insane" and that the lower court was therefore required "to provide treatment," Brief for Appellant at 43, and appellant's testimony at the probation revocation hearing, where, as indicated by the portions we have quoted, page 22, *supra,* appellant took the position that he had been treated unfairly and did not need medicine.

... is dangerous and should not be out on the streets") and the particular circumstances of the offense (including the circumstances of appellant's violation of probation). What the record does not make plain is how, or why, the lower court believed that a sentence of imprisonment represented the minimum sentence consistent, not only with the offense and with protecting the public, but with appellant's rehabilitative needs. So far as we can determine from the record, appellant is so mentally ill that he does not belong in, and cannot be helped by being in, a prison; and while we agree that he should be kept off the streets, it is not apparent why that cannot be accomplished by involuntary commitment to a mental institution.

■ A sentencing judge has a dual responsibility. The first responsibility is a fact-finding responsibility: the judge must be sure he has enough information. The second responsibility is an application—and—explanation responsibility: the judge must apply to the information he has gathered the guidelines specified in the Sentencing Code, 42 Pa.C.S. § 9701 *et seq.*, and explain how the sentence he has selected is responsive to, and reflects the standards embodied in, those guidelines. If the judge fails to fulfill these responsibilities, we must vacate the sentence and remand for resentencing. *Commonwealth v. Kraft,* 294 Pa.Superior Ct. 599, 440 A.2d 627 (1982); *Commonwealth v. Doyle,* 275 Pa.Superior Ct. 373, 418 A.2d 1336 (1979); *Commonwealth v. Wicks, supra.* Here, we are not satisfied that either responsibility has been fulfilled. As regards fact-finding, the psychiatric testimony seems to us inadequate and confusing; and as regards application—and—explanation, we are unable to determine why appellant was imprisoned rather than involuntarily committed. We are confident, given the lower court's obvious concern, that on remand, with the help of further testimony, including a fresh look at appellant's condition, these issues will be resolved.

The judgment of sentence is vacated and the case remanded for resentencing.