J-S09007-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| SHAQUILLE HENDERSON | : | |
| | : | |
| Appellant | : | No. 2245 EDA 2020 |

Appeal from the PCRA Order Entered November 10, 2020
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0009598-2013

BEFORE:   LAZARUS, J., KUNSELMAN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LAZARUS, J.:                    **FILED MAY 16, 2022**

Shaquille Henderson appeals from the trial court's order denying his petition filed pursuant to the Post Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.  After careful review, we affirm based on the well-reasoned opinions authored by the Honorable Lillian H. Ransom and the Honorable Tracy Brandeis-Roman.

In March 2013, police responded to a shooting at 1311 W. Butler Street in Philadelphia.  A witness had called 9-1-1 after hearing several gunshots at a boarding home where the witness, the victim, and Henderson lived.  The witness found the victim unresponsive on the floor of a room on the third floor of the boarding home.  Upon their arrival, officers observed the victim lying in the hallway suffering from multiple gunshot wounds.

_____

[*] Former Justice specially assigned to the Superior Court.

The victim was pronounced dead at the scene; an autopsy revealed that he had been shot nine times, suffering three independent fatal wounds—one to the left side of the head, one near the base of the neck, and one directly to the heart. Among other things, police recovered an empty firearm lock box for a Glock pistol in one of the third-floor bedrooms, and nine fired cartridge casings on the steps leading from the second floor to the third-floor hallway of the boarding house.

Henderson was able to elude capture until April 25, 2013. On that date, officers observed Henderson sitting on a bench outside a Starbucks on Temple University's campus. Knowing there was an outstanding warrant for Henderson's arrest on an unrelated case, the officers approached him. Henderson fled as soon as he saw the officers. During their pursuit of Henderson, officers observed him discard a weapon into a nearby alleyway.[1] The weapon, a police-issued Glock 17 pistol, was later recovered and determined to be the murder weapon in the March 2013 Butler Street shooting. The gun had been reported stolen from an apartment on September 13, 2012, during a burglary.

Henderson filed a pre-trial motion to suppress "any and all evidence recovered from his person[,] . . . any and all information retrieved from a cell phone(s) recovered from his person at the time of his arrest[, and] all items of physical evidence recovered inside 1311 W. Butler Street," including the

---

[1] Henderson was arrested and found to be in possession of several grams of crack cocaine.

lockbox and cartridge casings. Motion to Suppress Physical Evidence, 9/16/14, at 1-2. On September 25, 2014, the court held a suppression hearing at which six officers and detectives involved in the case testified for the Commonwealth. At the beginning of the hearing, Henderson's counsel acknowledged that he was not contesting the officers' authority to enter the property or their right to examine the common areas of the boarding house. N.T. Suppression Hearing, at 8. Following a suppression hearing,[2] the court granted Henderson's motion in part, suppressing fingerprints found on items inside Henderson's backpack and photos found on Henderson's cell phone. The court, however, denied the motion with respect to the lockbox and casings.[3]

Following the hearing, the court issued its findings of fact and conclusions of law, which included the following:

> [] Officer [Robert] Slaughter was the first responder and he spoke with a male who gave consent for the officer to enter the location.
>
> [] Upon entry the officer found fired cartridge casings on the stairway going from the second to the third floor, and he located a bleeding and unresponsive male lying in the hallway of the third floor.

---

[2] The court issued detailed findings of fact and conclusions of law, in compliance with Pa.R.Crim.P. 581(I).

[3] Although unrelated to the issue on appeal, Henderson also sought to suppress his post-arrest statement, made to a lieutenant, claiming it was made in violation of his state and federal rights where it was taken without counsel present or a valid waiver of his right to counsel.

[] Officer Slaughter testified that he secured the crime scene and that he opened no doors at that location.

\*    \*    \*

[] The door to the third[-]floor bedroom was in the open position in the photos taken by the Crime Scene Unit.  Officer Jacqueline Davis testified that the door was open when she arrived.

\*    \*    \*

[A] search and seizure warrant was executed on March 8, 2013[,] and the following items were recovered:

> Fired cartridge casings from the second[-]floor landing and from the stairway leading from [the] second to [the] third floors[; and]

> An empty gun box which was in plain view on the bed in the third[-]floor bedroom[.]

Findings of Fact and Conclusions of Law, 10/7/14, at ¶¶ 2-4, 6, 9.

A five-day jury trial was held in October 2014.  On October 31, 2014, Henderson was found guilty of first-degree murder[4] and related offenses and sentenced to mandatory term of life in prison without the possibility of parole.[5] the above-stated offenses and sentenced to a mandatory term of life in prison without the possibility of parole.  Henderson timely filed post-sentence

---

[4] 18 Pa.C.S.A. § 2502.

[5] Henderson was also charged with various violations of the Uniform Firearms Act (VUFA) and possession of an instrument of crime (PIC).  In addition to murder, he was convicted of carrying firearms in public in Philadelphia (M-1), 18 Pa.C.S.A. §6108.  Henderson was sentenced "with no further penalty" on the section 6108 offense.

motions that were denied by operation of law. Henderson filed a timely notice of appeal; our Court affirmed his judgment of sentence. ***Commonwealth v. Henderson***, No. 870 EDA 2015 (Pa. Super. filed April 28, 2017) (unpublished memorandum decision).[6] The Pennsylvania Supreme Court denied Henderson's petition for allowance of appeal on August 9, 2017. ***See id.***, No. 236 EAL 2017 (Pa. filed Aug. 9, 2018) (order).

On May 16 2018, Henderson filed a *pro se* PCRA petition. The court appointed counsel, who filed an amended PCRA petition on September 15, 2019. The trial court issued Pa.R.Crim.P. 907 notice of its intent to dismiss Henderson's petition without a hearing on September 23, 2020. Henderson filed a Rule 907 response on October 6, 2020. On November 10, 2020, the court dismissed the petition.

Henderson filed a timely notice of appeal and court-ordered Rule 1925(b) statement. He raises the following issue for our review, "Did the trial court err in denying [Henderson's] amended PCRA petition without a hearing after appellate counsel failed to argue a challenge to the suppression ruling

---

[6] In his Pa.R.A.P. 1925(b) concise statement of errors complained of on direct appeal, Henderson included an issue regarding the improper admission of the firearm lockbox and empty shell casings. However, in his appellate brief, counsel did not include the issue. ***See*** Pa.R.A.P. 1925(b) Concise Statement, 4/16/15, at 2 ("The Defendant must be awarded a new trial as the [c]ourt allowed the introduction of evidence, i.e. an empty gun box and various ballistics evidence, that were recovered inside a room located within 1311 W. Butler Street.").

on direct appeal after raising same in the [Rule] 1925([b]) statement?" Appellant's Brief, at 4.[7]

Our standard of review from the denial of a PCRA petition "is limited to examining whether the PCRA court's determination is supported by the evidence of record and whether it is free of legal error." **Commonwealth v. Ousley**, 21 A.3d 1238, 1242 (Pa. Super. 2011) (citation omitted). "The PCRA court's credibility determinations, when supported by the record, are binding on this Court; however, we apply a *de novo* standard of review to the PCRA court's legal conclusions." **Commonwealth v. Mitchell**, 105 A.3d 1257, 1265 (Pa. 2014) (citation omitted).

Moreover, a PCRA petitioner has "no absolute right to an evidentiary hearing on a . . . petition, and if the PCRA court can determine from the record that no genuine issues of material fact exist, then a hearing is not necessary."

_____

[7] Henderson's single issue on appeal raises a claim of ineffectiveness of appellate counsel. To be entitled to relief on a claim of ineffective assistance of counsel, a petitioner must establish that: (1) the underlying claim has arguable merit; (2) counsel lacked a reasonable basis for his action or inaction; and (3) but for the act or omission in question, the outcome of the proceedings would have been different (i.e., petitioner was prejudiced). **See Commonwealth v. Washington**, 927 A.2d 586, 594 (Pa. 2007). "A claim of ineffectiveness may be denied by a showing that the petitioner's evidence fails to meet any of these prongs." **Id.** (citations omitted). **See also Commonwealth v. Turetsky**, 925 A.2d 876, 880 (Pa. Super. 2007) (citations omitted) (to establish ineffectiveness under PCRA, petitioner "must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place"). Finally, we presume that the petitioner's trial counsel was effective. **Commonwealth v. Freeland**, 106 A.3d 768, 775 (Pa. Super. 2014).

*Commonwealth v. Jones*, 942 A.2d 903, 906 (Pa. Super. 2008) (internal citation omitted); *see also* Pa.R.Crim.P. 907(1).  We review a PCRA court's decision to dismiss a petition without a hearing under an abuse of discretion standard.  *See Commonwealth v. Brown*, 196 A.3d 130, 192-93 (Pa. 2018) (internal citation omitted).

Here, testimony at Henderson's suppression hearing revealed that the ballistic evidence was in open view in the common area of the boarding house—specifically in the stairway leading from the second floor to the third-floor hallway.  N.T. Suppression Hearing, 9/25/14, at 76, 81, 86, 90.  *See Commonwealth v. Hendrix*, 627 A.2d 1224, 1226 (Pa. Super. 1993) (subjective expectation of privacy for item in area of common access deemed unreasonable; visual observation of evidence located in open view in unprotected area does not constitute search so as to trigger Fourth Amendment protections).

Moreover, investigating officers testified that the door to Henderson's third-floor bedroom was ajar when they arrived at the scene, and that the lock box was in plain view on the bed in Henderson's bedroom.  N.T. Suppression Hearing, 9/25/14, at 75-76, 81, 91-94.  Photographs from the crime scene, taken while evidence was being collected and subsequently admitted into evidence, confirmed that the bedroom door was open.  *Id.* at 91-92.  Thus, no search warrant was necessary to retrieve the lock box.  *See Commonwealth v. Anderson*, 40 A.3d 1245, 1248 (Pa. Super. 2012) (citations omitted) ("[E]vidence in plain view of the police can be seized

- 7 -

without a warrant . . . if:  1) police did not violate U.S. Const. amend. IV during the course of their arrival at the location where they viewed the item in question; 2) the item was not obscured and could be seen plainly from that location; 3) the incriminating nature of the item was readily apparent; and 4) police had the lawful right to access the item.").

After reviewing the certified record, the parties' briefs, and relevant case law, we rely upon the opinions, authored by Judge Ransom and Judge Brandeis-Roman, to affirm the court's denial of Henderson's PCRA petition. *See* Trial Court's Rule 1925(b) Opinion, 9/17/15, at 8; PCRA Court's Rule 1925(b) Opinion, 6/9/21, at 7-10.  Henderson's underlying claim lacks arguable merit; thus, he cannot succeed in his ineffectiveness claim. *Washington*, *supra*.  Moreover, because no genuine issues of material fact exist, the PCRA court correctly determined that a hearing on Henderson's petition was not necessary.  *Jones*, *supra*.  We instruct the parties to attach the opinions in the event of further proceedings in the matter.

Order affirmed.


Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/16/2022

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
CRIMINAL TRIAL DIVISION

COMMONWEALTH : CP-51-CR-0009598-2013
: CP-51-CR-0009569-2013
v. :
:
:
SHAQUILLE HENDERSON :

**OPINION**

Brandeis-Roman, J. June 9, 2021

Appellant Shaquille Henderson has filed an appeal from this court's Order dismissing his petition

which sought relief pursuant to the Post-Conviction Relief Act, 42 Pa.C.S. § 9541 *et seq*.,

Appellant's first PCRA Petition.

**PROCEDURAL HISTORY AND FACTS**

On March 8, 2013, Tony Martin ("Victim") was at a boarding house he owned at 1311

West Butler Street, Philadelphia, Pennsylvania. He knocked on the door of boarder, Denise

Rahman ("Witness"), who lived on the second floor of the home. The Witness, who was waiting

to go to a doctor's appointment, opened her door and paid rent to the Victim, who then proceeded

to the third floor. A few minutes later the Victim returned to the Witness's room and asked her if

she had seen Appellant, his nephew, who lived on the third floor. The Witness replied that she

hadn't seen Appellant, and the Victim mentioned that he would return later.

While the Victim was gone, the Witness heard Appellant enter the home and walk up to

the third floor. Appellant was up there for a few minutes before heading to the second floor and

knocking on the Witness's door, asking her if anyone had gone through his third floor room. The

1

Witness mentioned that the Victim had been up there. Appellant appeared upset by this news and went back upstairs. The Victim returned home at some point after that and the Witness went downstairs to inform him that the Appellant was home. The Victim went upstairs and told Appellant that they needed to speak privately. Both men entered the Appellant's apartment.

The Witness heard both men arguing on the floor above her. The Victim went downstairs after several minutes of arguing, appearing upset, and spoke to the Witness who helped calm him down, after which the Victim returned to the third floor. A few minutes later, while the Witness was in her room, she heard four to five gunshots ring out, causing her to dive into her closet for cover. The Witness heard someone running down the stairs of the house and, upon looking out of her window, saw the Appellant riding away on a bicycle. The Victim claims that at no point did she see anyone else interacting with the Victim or the Appellant.

Granville Worthington, another boarder, was asleep in his room on the first floor when he was awoken by the sound of gunfire. He heard someone coming down the stairs in a hurry as he got out of bed but by the time he opened the door, Mr. Worthington did not see anyone. Mr. Worthington went upstairs after hearing the Witness calling out for the Victim and, upon arriving on the third floor, saw the Victim unresponsive on the ground. Mr. Worthington called 911. The Victim was pronounced dead at the scene and an autopsy would reveal that the Victim was shot nine times, three of these shots each being independently fatal. The third floor room became a crime scene from which an empty Glock firearm lockbox was recovered. Nine fired cartridge casings were discovered in the hallway.

Appellant was not able to be located until April 25, 2013, when Officer Michael O'Brien and two of his colleagues were at a Starbucks at Temple University and spotted Appellant sitting outside on a bench. Recognizing Appellant was a wanted man, they attempted to make an arrest

2

with Appellant fleeing as soon as he spotted the officers. During the ensuing chase, Appellant reached behind his back and threw a pistol into a nearby alley. Officer O'Brien stopped to retrieve the pistol as his fellow officers apprehended Appellant. Appellant was found in possession of several grams of crack cocaine during a search incident to his arrest, as well as a cell phone which had a photo of a gun, money, and drugs on its lock screen. The pistol turned out to be a police issued Glock 17 pistol which allegedly was stolen from Appellant's aunt, Philadelphia Police Officer Fatima Henderson, months before the murder occurred. Ballistics testing showed that the casings found at the scene of the murder were fired from the gun Appellant had thrown into the alleyway during his flight.

On September 25, 2014, a pre-trial motion to suppress was litigated before the Honorable Lillian H. Ransom, and on October 7, 2014, Judge Ransom suppressed the fingerprints recovered from items found inside a backpack owned by Appellant because those items were not in plain view and no warrant was obtained prior to the police opening the backpack and testing for fingerprints. Judge Ransom also suppressed any photos found on the cell phone other than the photo on the lock screen. However, Judge Ransom permitted the drugs, the gun, and the cell phone found on Appellant to be used at trial, as well as photos provided to police by the Appellant's family because "there was no police activity involved in securing these photos".

In October of 2014, a five day jury trial commenced in this matter, and on October 31, 2014, Appellant was found guilty of first-degree murder and carrying firearms on a public street. On November 7, 2014, Appellant was sentenced to a mandatory, aggregate term of life imprisonment. On November 14, 2014, Appellant filed post-sentence motions that were denied by operation of law on March 16, 2015. On March 24, 2015, Appellant filed a Notice of Appeal to

3

the Pennsylvania Superior Court, followed by his statement of Matters Complained on Appeal on April 16, 2015.

On April 28, 2017, the Superior Court of Pennsylvania affirmed Appellant's judgment of sentence. Appellant timely filed a notice of appeal to the Supreme Court of Pennsylvania on May 26, 2017, which was subsequently denied on August 8, 2017. On May 16, 2018, Appellant filed a *pro se* PCRA Petition, his first one. On December 18, 2018, Gina Amoriello, Esquire, entered her appearance on Appellant's behalf and on September 15, 2019, filed an Amended PCRA Petition. This matter was reassigned to this court on February 3, 2020. The Commonwealth filed a motion to dismiss on May 3, 2020.

On September 23, 2020, a 907 Notice of Dismissal was filed by this court. Appellant filed a response to the 907 Notice on October 6, 2020. An order dismissing Appellant's PCRA Petition was filed on November 10, 2020. On November 20, 2020, Appellant filed an initial notice of appeal to the Pennsylvania Superior Court, although a portion of the appeal was discontinued on January 19, 2021, by Attorney Amoriello. On February 10, 2021, a 1925(b) order was issued by this court and in response, on February 12, 2021, Appellant filed his statement of matters complained of on appeal through Attorney Amoriello.

## ISSUES RAISED BY APPELLANT ON APPEAL

I.      Did the trial court err in denying Petitioner's Amended PCRA Petition without a hearing as a prima facie showing of ineffective assistance of counsel was made for failing to challenge the suppression ruling on direct appeal after raising same in his 1925b statement?

## DISCUSSION

"It is well-settled that the PCRA is intended to be the sole means of achieving post-conviction relief." Commonwealth v. Taylor, 2013 PA Super 89, 65 A.3d 462, 465 (Pa.Super. 2013) (citing Commonwealth v. Haun, 613 Pa. 97, 32 A.3d 697 (Pa. 2011)). When reviewing the

4

denial of PCRA relief, the appellate court's review is "limited to determining whether the PCRA court's findings are supported by the record and without legal error". <u>Commonwealth v. Edmiston</u>, 619 Pa. 549, 65 A.3d 339, 345 (Pa. 2013) (citing <u>Commonwealth v. Breakiron</u>, 566 Pa. 323, 781 A.2d 94, 97 n. 4 (Pa. 2001)). The court's scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in light most favorable to the prevailing party. <u>Commonwealth v. Fahy</u>, 598 Pa. 584, 959 A.2d 312, 316 (Pa. 2008) (citing <u>Commonwealth v. Duffey</u>, 585 Pa. 493, 889 A.2d 56, 61 (Pa. 2005)). The burden is on the petitioner in the PCRA petition to demonstrate by a preponderance of the evidence that he or she is eligible for PCRA relief. 42 Pa.C.S.A § 9543.

## 1) TRIAL COUNSEL WAS NOT INEFFECTIVE FOR FAILING TO CHALLENGE THE SUPPRESSION RULING.

Appellant alleges that the trial counsel was ineffective for not challenging the suppression ruling regarding the gun box and ballistic evidence recovered from 1311 Butler Street. This issue is meritless.

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

"The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor without probable cause, supported by oath or affirmation subscribed to by the affiant." Pa. Const. art. I, § 8.

"Our supreme court has interpreted Article I, § 8 protection more broadly than the Fourth Amendment and has found that a seizure occurs when an officer gives chase. *Compare California*

5

*v. Hodari D.,* 499 U.S. 621, 629, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), *with Commonwealth v. Matos,* 543 Pa. 449, 672 A.2d 769, 776 (1996). Under Pennsylvania law, any items abandoned by an individual under pursuit are considered fruits of a seizure. *Matos,* 672 A.2d at 770. Those items may only be received in evidence when an officer, before giving chase, has at least the reasonable suspicion necessary for an investigatory stop. *Id.* at 771. Stated another way, when one 'is unconstitutionally seized by the police, i.e. without reasonable suspicion or probable cause, any subsequent flight with the police in pursuit continues the seizure and any contraband discarded during the pursuit is considered a product of coercion and is not admissible against the individual.' *Commonwealth v. Wimbush,* 561 Pa. 368, 750 A.2d 807, 810 n. 5 (2000)." Commonwealth v. Lynch, 773 A.2d 1240, 1243 (Pa.Super. 2001).

"In order to demonstrate reasonable suspicion, the police officer must be able to point to specific and articulable facts and reasonable inferences drawn from those facts in light of the officer's experience. Case law has also established that certain facts taken alone do not establish reasonable suspicion. For instance, in *Matos,* it was determined that flight alone does not constitute reasonable suspicion; in *Commonwealth [v.] Kearney [,* 601 A.2d 346 (Pa.Super.1992),] mere presence in a high crime area did not constitute reasonable suspicion; and under *Commonwealth [v .] Hawkins [,* 692 A.2d 1068 (Pa.1997),] an anonymous tip alone did not constitute reasonable suspicion. [That] being stated, the determination of reasonable suspicion requires an evaluation of the totality of the circumstances, with a lesser showing needed to demonstrate reasonable suspicion in both terms of quality and content and reliability than probable cause. In the instant matter there is a combination of factors present which would warrant reasonable suspicion by the officer. As stated, there was an anonymous tip, in fact several anonymous tips made to police regarding a fight in the area; the fact that this was a high crime area; the actions taken by the juveniles in tracking

6

the police officers; and then finally the flight by the Juvenile. All of these factors taken collectively constitute reasonable suspicion for the officer to pursue the Juvenile." In re D.X.P., 2015 WL 6941299, at *6 (Pa.Super.Ct. July 10, 2015).

"The plain view exception to the warrant requirement allows the police to seize objects that are viewed from a lawful vantage point where the incriminating nature of the object is immediately apparent." Commonwealth v. McCree, 924 A.2d 621, 625 (Pa. 2007). "This standard, therefore, contains three prongs: (1) the police must be at a lawful vantage-point; (2) the incriminating character of the object must be immediately apparent; and (3) the police must have a lawful right of access to the object." *Id.*

It is vital to address the fact that various pieces of evidence were suppressed by Appellant's trial counsel, Joseph Schultz, Esquire. These pieces of evidence include fingerprints obtained from items[1] that were contained inside a backpack that were extracted from the backpack without a warrant, photos[2] on the Appellant's phone that needed to be unlocked to access, and the statement Appellant gave to Lt. Deblassis. This information comes directly from Judge Ransom's findings of fact and conclusions of law. As this issue is not in dispute, it is thus not being analyzed here but rather merely noted.

The remaining evidence in dispute, namely the ballistics evidence and the gun box, were also properly admitted at trial. Granville Worthington, a witness at trial who lived in the boarding house, testified that he was asleep at the time of the Victim's murder but was woken up to the sound of gunshots. N.T. 10/27/2014, page 179 lines 9-20. Mr. Worthington testified that after hearing Denise Rahman shouting out to the Victim, he went upstairs and saw the Victim

---

[1] These items in the backpack were not in plain view even though the backpack was.
[2] The court found that the photo on the lock screen of the phone was admissible because that could be viewed without Appellant's password.

7

unconscious on the ground, prompting him to call 911. N.T. 10/27/2014, page 180 lines 6-22. Mr. Worthington also testified that when he called 911, he had informed police that his landlord had been shot. N.T. 10.27/2014, page 181 lines 17-20. Officer Robert Slaughter testified that, upon pulling up to the boarding house, he was met by "A black gentleman in front of the property" and that, after being informed that a male was shot upstairs, Officer Slaughter went upstairs. N.T. 10/27/2014, page 105 lines 18-23. Officer Slaughter further testified to the fact that aside from the Victim, he saw numerous bullet casings on the steps leading up to the third floor. N.T. 10/27/2014, page 107 lines 2-6.[3] It is clear that based on the available facts, after the Victim was shot, residents of the boarding house called the police and invited the arriving officers inside to investigate the crime.[4] The police, upon arriving, saw bullet casings in the common stairway used by residents to go up and down the house. Because police had been summoned to the home and because police spotted the bullet casings on the stairway, an area of the house over which no one resident had exclusive control, it is clear that the police meet all three factors of the McCree test and thus lawfully observed the casings in plain view. As such, the police properly seized the casings and the casings were properly admitted into evidence.

It appears that the gun box was also properly admitted. Detective James Crone testified at the suppression hearing that the door to the room immediately adjacent to the Victim's body was open. N.T. 09/25/2014, page 76 lines 8-13. Detective Crone also testified that through the open door he was able to see a gun box sitting on the bed of that room. N.T. 09/25/2014, page 75 line 24 through page 76 line 3, page 76 lines 14-16. However, Detective Crone also testified that he

---

[3] This is supported by testimony from Detective James Crone who testifies that almost all of the fired cartridge casings were found in the common area. N.T. 09/25/2014, page 76 lines 17-21.

[4] It should be noted that trial counsel for Defendant, Joseph Schultz, Esquire, states that he believes that Detective Slaughter was permitted into the boarding house by an occupant and thus did not contest the consent to enter the property or examine the common areas. N.T. 09/25/2014, page 7 line 24 through page 8 line 14.

8

did not know if the door had been left open or if another officer had opened it. N.T. 09/25/2014, page 77 lines 9-17. Officer Slaughter has testified that he did not open or shut any doors while he was at the boarding house. N.T. 09/25/2014, page 81 lines 11-20. Officer Slaughter reaffirmed this testimony on cross-examination and stated that there was an open door to a room that he looked in at one point. N.T. 09/25/2014, page 87 lines 9-11, lines 20-21. Officer Jacquelin Davis testified that when she arrived at the scene that the door to the room with the gun box was open. N.T. 09/25/2014, page 91 line 13 through page 92 line 6. Officer Davis also testified that she has no knowledge of how that door was opened. N.T. 09/25/2014, page 99 lines 5-24.[5] Due to the fact that the circumstantial evidence and testimony indicates that police did not open Appellant's door, the fact that there is a lack of evidence that would otherwise show that the police opened Appellant's door, and the fact that Judge Ransom's findings of fact indicate that the door to Appellant's room was open when police arrived prevented this court from being able to make a determination that the door was closed when police arrived at the boarding house.

Based on the facts that indicate that Appellant's door was open when police arrived on the scene, and based upon the facts stated *supra* that show the police were legally permitted to be in the boarding house while investigating the Victim's murder, then it is more than likely that the gun box would have been well within plain view based on the door to Appellant's room being open. It is clear that the police met all three factors of the <u>McCree</u> test and thus lawfully observed the gun

---

[5] The circumstantial evidence surrounding this incident seem to indicate that Defendant was the one who left his room door open. Witness Denise Rahman testified that after the Victim went upstairs to talk to the Defendant, she heard gunshots, then heard footsteps coming from upstairs going downstairs, then heard doors opening but didn't hear doors closing, clarifying that the heard the front doors opening but not closing, and then looked out the window to see Defendant riding away on a bike. September 25, 2014, NoT, page 146 line 12 through page 147 line 25. Although she indicates that the doors she heard were the front doors, her testimony indicates that Defendant fled the house in a hurry, meaning he likely was rushing and did not close his own room door. This Court is not making a determination on this issue regarding the circumstantial evidence, merely providing context to what was reviewed.

9

box in plain view. As a result, police properly seized the gun box and the gun box was properly admitted into evidence.

The photos provided to police by Appellant's family were also properly admitted. Due to the fact that Appellant's family of their own free will provided photos to police, the Commonwealth was permitted to use those photos as evidence against Appellant at his trial. Appellant provides no legal authority that demonstrates why these photos would have been inadmissible when there was no police direction to Appellant's family in providing them.

Regarding the evidence collected as a result of Appellant's arrest, namely the gun, the drugs, and the cell phone (including the photo on the cell phone's lock screen). According to the testimony, it is evident that the gun was discarded by Appellant during his attempted flight from police. N.T. 09/25/2014, page 35 lines 4-20. Obviously, the firearm would qualify as evidence under Article 1, § 8 of the Pennsylvania Constitution, and would be considered fruits of a seizure. The inquiry thus becomes whether or not the police had at least reasonable suspicion to pursue and arrest Appellant before he discarded the firearm, the answer to which appears to be affirmative. Detective Stephen Grace testified at the suppression hearing that Appellant had a warrant out for his arrest based on a shooting of Jason Bradford at the intersection of 19th and 72nd Streets on December 27, 2011. N.T. 09/25/2014, page 20 lines 3-13. Detective Grace would further testify that although he did not recall the exact date they obtained an arrest warrant for Appellant, it was obtained at some point early in 2012. N.T. 09/25/2014, page 21 lines 12-16. Other than executing an arrest warrant, Detective Grace testified to preparing wanted posters and elicited the help of US Marshals, as well as obtained information that Appellant may have been riding a bike in both the 22nd and 39th Police Districts and informed the corresponding officers that the Appellant may be present in those districts. N.T. 09/25/2014, page 22 line 6 through page 23 line 4. Based on the

fact that a warrant was issued for Appellant's arrest in an unrelated case, Judge Ransom found that there was probable cause for police to stop and arrest Appellant. This court agrees: the fact that Appellant had a warrant issued for his arrest from an unrelated shooting that occurred in late 2011 coupled with the fact that the arresting officers recognized Appellant as having an arrest warrant gave police probable cause to stop and arrest Appellant. The fact that police picked up the discarded firearm during their pursuit of Appellant does not mean it must be excluded as per Article 1, § 8 of the Pennsylvania Constitution due to the existence of probable cause to stop and arrest Defendant.[6]

Accordingly, this court found Appellant's PCRA issue to be meritless and, accordingly, dismissed his petition.

## CONCLUSION

For the foregoing reasons, Appellant's motion for post-conviction collateral relief was properly dismissed as meritless. Accordingly, judgment of sentence should be affirmed.

BY THE COURT:

Brandeis-Roman, J.

---

[6] It should be noted that due to the fact that there was probable cause to arrest Appellant, the other evidence collected from him was all evidence collected in a search incident to arrest. Thus, the drugs and cell phone taken from Appellant were admissible as evidence. Judge Ransom also parsed out the evidence taken from Appellant's cell phone, admitting the photos that were used as the screen saver into evidence while precluding all evidence that police were only able to access upon using a code to unlock Appellant's phone, as the police obtained that evidence without a warrant.

11

# IN THE COURT OF COMMON PLEAS OF PHILADELPHIA
## FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
## CRIMINAL TRIAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | CP-51-CR-0009569-2013 |
| | : | CP-51-CR-0009577-2013 |
| | : | CP-51-CR-0009598-2013 |
| v. | : | |
| | : | |
| SHAQUILLE HENDERSON, APPELLANT | : | |
| | : | SUPERIOR CT: 870 EDA 2015 |

**FILED**

SEP 1 7 2015

Criminal Appeals Unit
First Judicial District of PA

## OPINION

RANSOM, J.                                    September 17, 2015

After entering guilty pleas on crimes charged on CP-51-CR-0005969-2013 and CP-51-CR-0009577-2013, and deferring sentencing, the Appellant, went to trial before a jury on crimes charged on CP-51-CR-0009598-2013. On October 1, 2014, the Appellant, Shaquille Henderson, also known as "Bishop" or "Shaq", was found guilty, by a jury sitting before this Court, of one (1) count of First Degree Murder[1], a felony of the first degree; and one (1) count of violation of the Uniform Firearms Act (VUFA) § 6106[2], a felony of the third degree.

Sentencing was scheduled for November 7, 2014 at which time, the Commonwealth moved to nolle prosse all bills other than the Murder and VUFA. This motion was granted. On that same day, the Appellant was sentenced to life in prison without parole on the First Degree Murder and no further penalty was imposed on the VUFA.

Timely post sentence motions were filed and were denied by operation of law on March 20, 2015. A Notice of Appeal was filed on March 24, 2015. When the notes of testimony became available, on March 27, 2015 this Court ordered the Appellant, pursuant to Pennsylvania Rule of

CP-51-CR-0009598-2013 Comm. v. Henderson, Shaquille M.
Opinion

---

[1] 18 Pa.C.S. §2502(c).
[2] 18 Pa.C.S. § 6106(a)(1).

1


7346259611

Appellate Procedure 1925(b), to file a concise, self-contained and intelligible statement of errors complained of on appeal. On April 16, 2015, counsel filed a timely 1925(b) statement of errors complained of on appeal to this Court. In his 1925(b) statement, Appellant raises the following four (4) issues:

(1) The Defendant should be awarded an arrest of judgement on the charge of Murder in the First Degree, as there is insufficient evidence to sustain the verdict. The Commonwealth did not prove that the Defendant was a principal, an accomplice or a conspirator to the homicide in question. Moreover, the Commonwealth did not prove, by sufficient evidence, that the Defendant acted with specific intent to kill, premeditation or malice and, hence, the Commonwealth has failed to prove the elements of the crime. An arrest of judgement must be awarded.

(2) In the alternative, the Defendant must be awarded a new trial as the greater weight of the evidence does not support the verdict. The greater weight did not support any proposition finding the Defendant guilty as a principal, an accomplice or a conspirator and the greater weight of the evidence did not support any finding of malice, specific intent to kill, nor premeditation and, hence, a new trial is required. The verdict was based on speculation, conjecture and surmise.

(3) The Defendant must be awarded a new trial as the Court allowed the introduction of evidence, i.e. an empty gun box and various ballistics evidence, that were recovered inside a room located within 1311 W. Butler Street.

(4) The Defendant must be awarded a new trial as the result of improper jury tampering. The Defendant, upon knowledge, information and belief, averred at the end of trial, and avers on appeal, that an Assistant District Attorney who prosecuted him in a different case interfered

2

with the jury function by walking into the jury deliberation room and acting improperly. A new trial is required.

## FACTS

On March 8, 2013, at approximately 2:00 P.M., Tony Martin ("Martin") was shot and killed inside of the boarding house which he owned at 1311 West Butler Street in the City and County of Philadelphia.

On that day prior to the incident, Denise Rahman, ("Rahman") who had rented a room on the second floor since July 2012, had spoken with Martin when he came to collect the rent. After speaking with her, Martin went to the third floor where the Appellant shared a room with another male called "Gee". Rahman heard a knock on the door of the third floor room, but shortly Martin came back downstairs and continued to speak with her. Martin then left the location, stating that he would be back. Rahman noted that there was no one on the third floor at this time, as she did not hear any movement upstairs and Martin was the only person who ascended the stairs to the third floor at that point in the day. Appellant arrived soon after Martin left. Appellant spoke with Rahman then went to the third floor. Appellant came back down and asked whether anyone had been upstairs. Rahman told Appellant that Martin was the only person who had been upstairs, after which Appellant returned to the third floor. When Martin returned, the Appellant came back to the second floor where he and Martin has a conversation in which Martin told Appellant that they needed to talk upstairs. Both males then went to the third floor. Rahman soon heard raised voices but could not determine what was being said. Martin returned to the second floor but then went back upstairs. Next, Rahman heard four to five (4-5) gunshots then heard footsteps coming rapidly down the stairs and immediately after she heard the exterior door to the building being opened. Rahman looked out of her window and saw

3

Appellant leaving the area on a bicycle. Rahman testified that Appellant was already living on the third floor when she had moved in during July 2012.

Granville Worthington ("Worthington"), a first floor tenant at the boarding house owned by Martin, had been sleeping that afternoon but was awakened by four to five (4-5) gunshots which seemed to come from overhead. Worthington also heard footsteps rapidly descending the stairs of the building and heard the front door open, but did not see who was moving about. Worthington went to the stairway between the second and third floors where he found decedent lying unresponsive on the floor. Worthington noted that no one was on the third floor at that time.

Sam Cook ("Cook"), another tenant from the first floor, was awakened by what he believed to be banging noises; that he heard rapidly footsteps coming down the steps and heard the exterior door open. Cook did not see the person who was running.

Police Officer Robert Slaughter ("Officer Slaughter") was the first officer to respond to the location. Upon arrival he spoke with a black male who told the officer that a man had been shot and was still inside of the house. Upon entry, Officer Slaughter found the decedent bleeding and lying unresponsive on the third floor landing. Officer Slaughter observed numerous fired cartridge casings (FCC's) on the stairway leading from the second to third floor. Emergency medical personnel arrived but were unable to revive decedent.

Martin was shot nine (9) times. Chief Medical Examiner Dr. Sam Gulino testified that the cause of death was multiple gunshot wounds. Three (3) of the wounds, one (1) to the left side of the head; one (1) to the left ear; and one (1) to the chest; standing alone, would have been fatal. The manner of death was found to be homicide.

Police Officer Jacqueline Davis ("Officer Davis") processed the scene for the Philadelphia Crime Scene Unit. Officer Davis testified that the door to one (1) of the third floor bedrooms was ajar

4

when she arrived and that she could see a Glock gun box on the bed. Officer Davis took numerous photographs including that of the gun box. She also recovered ballistics evidence including the FCC's from the second and third floor hallways but was unable to recover any identifiable fingerprints.

The Appellant was arrested on April 25, 2013, and was found to be in possession of a nine millimeter Glock-17 handgun. Forensic analysis showed that all nine (9) FCC's found at the scene and the bullet fragments recovered from the decedent's body were fired from the Glock handgun in Appellant's possession at the time of his arrest.

## LEGAL DISCUSSION

The Appellant raises four (4) issues on appeal. The first issue Appellant raises is:

**The defendant should be awarded an arrest of judgment on the charge of murder in the first degree, as there is insufficient evidence to sustain the verdict. The Commonwealth did not prove that the defendant was a principal, an accomplice or a conspirator in the homicide in question.**

The defendant in a court case shall have the right to make a post-sentence motion, which may include: . . . a motion in arrest of judgment. Pa.R.Crim.P. Rule 720(B)(1)(a)(iii). Issues not raised at trial nor in post-trial motions, cannot be raised for the first time on direct appeal. Commonwealth v. Kaye, 232 Pa. Super. 513, 517, 335 A.2d 430, 432 (1975) citing Commonwealth v. Agie, 449 Pa. 187, 296 A.2d 741 (1972), see also Pa.R.Crim.P. Rule 720(B)(1)(c).

In the instant case, Appellant failed to raise this motion in arrest of judgement during trial or in post-sentence motions, therefore this claim is not properly preserved for appeal and is deemed waived.

5

The second claim Appellant raises is:

**In the alternative, the Defendant must be awarded a new trial as the greater weight of the evidence does not support the verdict. The greater weight did not support any proposition finding the Defendant guilty as a principal, an accomplice or a conspirator and the greater weight of the evidence does not support any finding of malice, specific intent to kill, nor premeditation and, hence, a new trial is required. The verdict was based on speculation, conjecture and surmise.**

The standard of appellate review for a claim that the verdict was against the weight of the evidence is limited to a determination of whether the trial court abused its discretion in denying the Appellant's post-verdict motion i.e. that the fact-finder's verdict "shocked the conscious." Commonwealth v. Lloyd, 2005 Pa. Super. 236, P12, 878 A.2d 867, 872 (2005). The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. Commonwealth v. Small, 559 Pa. 423, 435, 741 A.2d 666, 672 (Pa. 1999).

A criminal homicide constitutes Murder of the first degree when it is committed by an intentional killing.[3] An intentional killing is a killing by means of . . . any kind of willful, deliberate and premeditated killing.[4] To prove a charge of First Degree Murder, the Commonwealth must establish that Appellant had the specific intent to kill. Specific intent may be reasonably inferred from the use of a deadly weapon on a vital part of the victim's body. Id. A "deadly weapon" is defined as any device which, in the manner in which it is used, is likely to produce death or serious bodily

---

[3] 18 Pa.C.S § 2502(a)
[4] 18 Pa.C.S § 2502(d)

6

injury.[5] Thus, when someone fires a handgun at another, it is assumed the intent was to inflict serious bodily injury or death. Commonwealth v. Robinson, 817 A.2d 1153, 1160 (Pa. Super 2003).

Any person who carries a firearm in any vehicle or any person who carries a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license under this chapter commits a felony of the third degree.[6]

This claim lacks merit as the verdict in the instant case does not shock the conscience. The verdict in Appellant's case was supported by circumstantial evidence consisting of eye-witness testimony and ballistics evidence. Appellant, who was known to Rahman, was seen talking to Martin immediately prior to Martin being shot nine (9) times. (N.T. 10/27/14 141-145, N.T. 10/29/14 at 17-26). Two (2) of the gunshot wounds Martin suffered were to the head, and a third was to the chest, each wwas independently fatal. (N.T. 10/29/14 at 1-22). Rahman heard the two (2) men arguing, and testified that Appellant was the only person present on the third floor at the time Martin was shot. (N.T. 10/27/14 at 140). Three (3) tenants of the house testified that they heard gunshots followed by the sound of rapidly retreating footsteps. (N.T. 10/27/14 at 146, 179, 212). Rahman saw Appellant, who was wearing the same outfit he was wearing minutes prior to his argument with Martin, fleeing the scene on a bicycle. (N.T. 10/27/14 at 147). Worthington testified that after he heard the gunshots and went to check on Martin, there was no one present on the third floor. (N.T. 10/27/14 at 180). An empty Glock gun box was found on Appellant's bed. (N.T. 10/27/14 at 73).

When Appellant as apprehended on April 25, 2013, he was found to be in possession of a nine (9) millimeter Glock handgun, and the ballistics evidence recovered from the scene and from the decedent's body were found to be fired from the same Glock secured from Appellant. (N.T. 10/28/14

---

[5] 18 Pa.C.S.A. § 2301
[6] 18 Pa.C.S. § 6106(a)(1)

7

at 60-84). It was stipulated that the Appellant did not have a license to carry a firearm. (N.T. 10/27/14 at 6, 20). At the close of trial, the jury weighed the evidence, determined the credibility of the witnesses, and found that Appellant had the specific intent to commit First Degree Murder with a firearm that he did not possess a license to carry.

The third issue Appellant raises on Appeal is:

**The Defendant must be awarded a new trial as the Court allowed the introduction of evidence, i.e. an empty gun box and various ballistics evidence, that were recovered inside a room located within 1311 W. Butler Street**

The admission of evidence is committed to the sound discretion of the trial court and an appellate court may reverse only upon a showing that the trial court clearly abused its discretion. Commonwealth v. Bardo, 709 A.2d 871, 878 (Pa. 1998). Admissibility depends on relevance and probative value. Commonwealth v. Bullock, 948 A.2d 818, 827 (Pa. Super. 2008). Evidence is relevant if it logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable or supports a reasonable inference or presumption regarding a material fact. Id.

Prior to trial, this Court, on September 25, 2014, conducted a Suppression Hearing in which Appellant sought to suppress the admission of the very items outlined in this issue. The testimony on the motion and at trial showed that ballistic evidence was in plain view in the common area of the boarding house. (N.T. 9/25/14 at 81). Officer Davis testified that the door to Appellant's room on the third floor was open when she arrived, this was also evidenced by crime scene photographs she took while collecting documenting the FCC's surrounding the decedent. (N.T. 9/25/14 at 93). The gun box was in plain view in Appellant's room. (N.T. 9/25/14 at 75) Suppression of these items would have been improper, thus, this motion was denied. Appellant's claim for relief is without merit.

8

The fourth issue Appellant raises is:

**The Defendant must be awarded a new trial as a result of improper jury tampering. The Defendant, upon knowledge, information and belief, averred at the end of trial, and avers on appeal, that an Assistant District Attorney who prosecuted him in a different case interfered with the jury function by walking into the jury deliberation room and acting improperly. A new trial is required.**

Appellant's fourth issue is a bold assertion that does not cite any specific facts to support the error complained of, thus this Court will not respond.

## CONCLUSION

For the reasons set forth above, the decision of this Court should be affirmed.

BY THE COURT:

Ransom, J.

9